The STATE of Ohio, Appellee,

v.

CHAPPELL, Appellant.

[Cite as *State v. Chappell* (1994), 97 Ohio App.3d 515.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 66501.

Decided Dec. 5, 1994.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Ralph Kolasinski,* Assistant Prosecuting Attorney, for appellee.

*John P. Parker,* for appellant.

---

Harper, Judge.

Appellant, James Chappell, appeals from his conviction of rape and kidnapping in the Cuyahoga County Court of Common Pleas. Appellant was sentenced to life imprisonment on the rape conviction and ten to twenty-five years on the kidnapping conviction. For the reasons that follow, we affirm.

## I

The victim testified that she was a third grader on October 5, 1993. While she was visiting her Aunt Vicky on July 1, 1992, she was molested by "James" (appellant). She testified that she was raped by appellant. When asked to describe what happened, she stated, "He pulled down my clothes and he got on top of me." Appellant did not have his clothes on. Appellant took off her clothes and used the part of the body "between his legs" to touch between her legs. He put it inside of her.

She testified that the incident took place when she asked appellant for the key to use the bathroom. She came to a locked door and was let into the building by a lady before she asked appellant for the bathroom key. She had earlier been introduced to appellant by her Aunt Vicky.

When she asked appellant for the key, he led her to the security room door and held the door open for her. He locked the door after she was in the room. He put her on the floor and she was lying on her back. Appellant told her that if she said anything he would kill her. She was afraid. She told her grandmother and her mother the next day when she returned to Springfield.

She was taken to the hospital, where she talked to a doctor and a policeman. She later talked to a social worker.

Delores Davis testified that she is the victim's grandmother. On July 2, 1992 at about 2:30 p.m., the victim and her brothers and sister were brought back to Springfield by three adults, including appellant. She observed that the victim was by herself and did not socialize with the other children. Between 5:30 and 6:00 p.m., appellant and the other two adults, Vivian Taylor and Willie, left for Cleveland.

Davis testified that later that night her twelve-year-old daughter talked about the victim. She brought the victim to her bedroom. The victim was crying and

very upset. She asked her what was wrong. The victim told her that a security guard took her to the security office and took off her clothes. The victim told her that the security officer "took his penis and stuck it in her vagina." Davis then telephoned the victim's mother, who came over to the house and took the victim to the hospital.

Cheryl Spragg testified that she was the nurse who conducted the triage examination of the victim. The victim "was teary-eyed." "Her skin was warm and dry." The victim told her that "James raped me." She denied any oral or rectal penetration. She examined between her legs and found that her labia were "very reddened and swollen."

Dr. Rohn Kennington testified that he was the examining physician on duty the morning the victim was brought to the Community Hospital in Springfield. He testified that the victim told him that a man by the name of James took her to a room when she asked him for a bathroom key. While in the room, "he pulled his thing out, quote end quote, got on top of her and put his thing in her bottom. And she pointed to her female—to the perineal area, the area of the vagina when she told me that." "He threatened to kill her if she told anyone what he had done to her."

Kennington testified that during examination of the victim, "there appeared to be some redness of the opening, the labia and the opening to the vagina, and there was a tear—in the hymenal ring." "There wasn't any active bleeding, but it looked like something had happened recently."

Kennington further testified that the redness and the tear indicated some type of trauma to that area. When asked to explain what he meant by trauma, he responded:

"Trauma can mean one of several things. It could represent forcible penetration in a sexual assault. It could represent, some children use instruments or experiment and sometimes injure themselves with blunt or sharp objects that they play with.

"Q. Okay. Doctor, based upon a reasonable degree of medical certainty, taking into account the physical exam and the history conducted of this patient, do you have an opinion as to causation of this injury?

"A. It is my opinion that, given the child's history, as well as my physical findings, this overall picture is most consistent with a child who has been sexually assaulted."

There was no sperm found.

Susan Mitchell testified that she works as an outpatient therapist for Clark County Mental Health Services. She works with children, adolescents and their

families. She met privately with the victim on July 20, 1992. She asked the victim what had happened. She told her that someone by the name of James took her into a room in Cleveland and raped her.

Wendy Dixon testified that she was employed by the Clark County Department of Human Services as a social worker. She interviewed the victim with the help of anatomical drawings of a female child and an adult male. The victim told her that James had hurt her. She had asked James for the key to the bathroom. He took her to an office by the bathroom and hurt her. James pushed her to the floor, took her clothes off and put his penis in her "stuff." James told her that if she said anything to anyone he would kill her. She identified body parts of a male and a little girl in the drawings. She marked the parts with a yellow highlighter, explaining to Dixon how his penis went into her "stuff," pointing the arrow to the vagina area.

Vivian Taylor, a.k.a. Vicky, testified that she resides at 9500 Wade Park Road, Cleveland, Ohio. She has known appellant for two years. She went to Springfield in the summer of 1992 to bring her nieces, including the victim, and nephews to Cleveland. She had earlier introduced appellant to the children. She instructed the children to inform her when they wanted to use the restroom so she could take them to the restroom downstairs.

After the children played at the playground, they came back upstairs to her apartment. They ate and went to bed. The victim did not act unusual. Taylor testified that she was present when the victim took a bath and she saw her naked. She did not appear to be suffering from any injury or discomfort. The next morning Andrew Hill and appellant accompanied her to Springfield to return the children. Before they departed for Springfield, they stopped at her great-grandmother's to say goodbye. The victim talked with appellant "like she always did." She did not appear to be afraid of appellant.

When they arrived at Springfield, she introduced Hill and appellant to the children's mother and their grandmother. They spent about two hours in Springfield and said their goodbyes. The victim never indicated to her that anyone had hurt her.

Andrew Hill corroborated Taylor's testimony.

Appellant testified that he knew Taylor and her nephews and nieces. He would run into them almost every day as they played in the playground. He saw the victim on the day in question at Taylor's apartment. She did not appear any different than she had all other times. He noticed that the victim was more "hyper" than her other siblings. The victim did not show any indication that she was afraid of him. He accompanied Taylor and Hill to Springfield to drop off the children. The children were happy when they departed from Cleveland.

At no time did he take the victim to the bathroom. He denied ever having sex with the victim or taking off her clothes.

## II

Appellant assigns the following errors for our review:

"I. The court allowed impermissible hearsay testimony from the alleged victim's grandmother in violation of Ohio Rule of Evidence 803, the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

"II. The medical doctor who examined the alleged victim improperly testified as to his opinion of the veracity of the statements of the child declarant in violation of State v. Boston (1989), 46 Ohio St.3d 108 [545 N.E.2d 1220].

"III. Statements made to social workers by an alleged child-victim who testified at trial are hearsay and not admissible.

"IV. The evidence is insufficient to sustain the appellant's convictions for rape and kidnapping.

"V. The verdicts are against the weight of the evidence."

In his first and third assignments of error, appellant contends that the trial court erred by allowing hearsay statements made to third parties by the child victim. Appellant argues that since the child's statement to her grandmother was inadmissible hearsay, the trial court should not have allowed the child's grandmother to testify as to those statements. The state countered by arguing that the child's statement to her grandmother was admissible under the excited utterance exception to the hearsay rule pursuant to Evid.R. 803. Appellant further challenges the statement, claiming that it went beyond the Evid.R. 803 exception because the statement was made thirty-two hours after the event. Appellant argues that the child's activities [1] after the alleged rape occurred took the statement she made to her grandmother out of the excited utterance exception to the hearsay rule because "the alleged victim had more than adequate opportunity to reflect."

Evid.R. 803(2) and (4) read as follows:

---

1. Appellant described the activities as follows in his appellate brief: The child "went back to the playground with her siblings, ate dinner with her family and friends, was given a bath by her Aunt, fell asleep with her siblings, ate breakfast the next morning, visited her great-grandmother before leaving Cleveland [sic], rode for approximately four hours to Springfield, Ohio, played with her siblings some more, ate dinner in Springfield, fell asleep that evening and *then* told her grandmother about the alleged rape in the middle of the night."

"Hearsay Exceptions; Availability of Declarant Immaterial

"The following are not excluded by the hearsay rules, even though the declarant is available as a witness:

" * * *

"(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

" * * *

"(4) Statements for Purposes of Medical Diagnosis or Treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

The court in *State v. Dickerson* (1977), 51 Ohio App.2d 255, 5 O.O.3d 377, 367 N.E.2d 927, held that a statement does not qualify as an excited utterance unless it concerns an event sufficiently startling to render normal reflective thought processes inoperative and is a spontaneous reaction to the occurrence of the event and not the result of reflective thought. The Staff Notes to Evid.R. 803(2) list factors the court must consider in determining whether a statement qualifies as an excited utterance:

"To qualify as an excited utterance consideration must be given to (a) the lapse of time between the event and the declaration, (b) the mental and physical condition of the declarant, (c) the nature of the statement and (d) the influence of intervening circumstances."

The elements to be considered in determining what constitutes an excited utterance make it difficult for us to hold as a matter of law that thirty-two hours is too much time, especially for a nine-year-old child. The Ohio State Supreme Court held in *State v. Taylor* (1993), 66 Ohio St.3d 295, 303, 612 N.E.2d 316, 322, that:

"There is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought.

"Therefore the passage of time between the statement and the event is relevant but not dispositive of the question. '[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation.' *State v. Duncan* [1978], 53

Ohio St.2d [215] at 219–220, 7 O.O.3d [380] at 383, 373 N.E.2d [1234] at 1237 * * *." (Emphasis *sic.*)

In *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, paragraph two of the syllabus, the Ohio Supreme Court established a four-part test to determine the admissibility of a spontaneous exclamation:

"Such testimony as to a statement or declaration *may be* admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration." (Emphasis *sic.*) See, also, *State v. Duncan* (1978), 53 Ohio St.2d 215, 7 O.O.3d 380, 373 N.E.2d 1234.

In the instant case, the admissibility of the victim's grandmother's testimony would depend on the court's finding that the victim was still under stress of the startling occurrence. *Taylor, supra.* Being mindful of the fact that merely being upset clearly does not meet the standard for admissibility under Evid.R. 803(2), *Taylor, supra,* 66 Ohio St.3d at 303, 612 N.E.2d at 322, we shall review the testimony of the victim's grandmother.

"Q. Well, you tell us what was going on that afternoon between the adults at least.

"A. It is just they came and brought the children back home and they introduced themselves, and Vivian and them talked, and I talked with Vivian and them, and that was just about it.

"Q. Were the kids in the apartment at this time?

"A. No. They had went outdoors.

"Q. And [the victim] came back, right?

"A. [The victim] went off to herself.

"Q. What do you mean by that?

"A. She didn't socialize with the rest of them. She kind of stayed off to herself.

"Q. Inside or outside?

"A. She went outside.

"Q. And you saw this?

"A. Yes.

"Q. Did you go outside and actually see her off by herself?

"A. Yes. We had went—we had left from upstairs and went out and got chairs and sit out in front of. the door.

"Q. What were the kids doing outside?

"A. They were out there playing on the monkey bars.

"Q. How about [the victim]?

"A. [The victim], she had still went off to herself. She had left the rest of the children. I didn't know whether she went upstairs to her mother's apartment or what.

"Q. You didn't see her?

"A. No.

"Q. All right. Does [the victim] like to play with her brothers and sisters?

"A. Yes. They are very close.

"Q. Does she have friends in that apartment complex?

"A. Yes.

"Q. Does she play with those friends?

"A. Yes.

"Q. But not this afternoon?

"A. No.

"Q. You said approximately 5:30, quarter to 6:00 they leave.

"A. Yes.

"Q. Did you have dinner?

"A. No, we did not.

"Q. Do you know if [the victim] ate that evening either at your house or your daughter's house?

"A. She didn't eat at either one of their house. She said they had brought chicken coming back to Cleveland in the van, and they ate in the van.

"Q. Did she say if they drank anything in the van?

"MR. ADAMS: Objection.

"A. No, she didn't say.

"THE COURT: Sustained.

"Q. What happened between the hours of, let's say, 6:00 p.m.—I will rephrase my question.

"Where did [the victim] sleep that night?

"A. She slept with my older daughter in her bedroom. My 12 year old daughter in her bedroom.

"Q. In your apartment?

"A. Yes.

"Q. What's your daughter's name?

"A. Tiwana.

"Q. Why didn't she sleep in your apartment that night?

"A. She did sleep in my apartment that night. She asked could she spend the night with her grandmother.

"Q. You?

"A. Yes.

"Q. Did she regularly spend time sleeping at your apartment, or was this unusual?

"A. No, it was not unusual. When they are in school, most of them, each of them will take turns.

"Q. What time did she go to bed?

"A. She went to bed, I guess, about 9:30 or 10 o'clock, because they were watching a movie on TV.

"Q. Did your daughter go to bed at the same time?

"A. Yes.

"Q. What time did you go to bed?

"A. I went to bed about 10:30, quarter to 11:00.

"Q. Did there come a time that evening when one of the kids approached you?

"A. My 12 year old daughter approached me.

"Q. She approached you?

"A. Yes.

"Q. And without telling us what she said, what was her concern?

"A. She came into my room—

"MR. ADAMS: Objection.

"A. —and told me that [the victim] was crying—

"THE COURT: All right. Sustained. You can't say what she said.

"THE WITNESS: Okay.

"Q. Without telling, ma'am, what she said, what was her concern?

"MR. ADAMS: Objection.

"THE COURT: Who did she talk about?

"THE WITNESS: She talked about [the victim].

"THE COURT: All right. Just don't tell us what she said.

"Q. And after she talked about [the victim] what happened next?

"A. She told me that [the victim] was crying.

"MR. ADAMS: Objection.

"THE COURT: Sustained.

"Q. Ma'am, please listen to the question.

"A. Okay.

"Q. After she told you something about [the victim] did she leave the room then?

"A. Yes.

"Q. What room were you in?

"A. She left the room that I was in.

"Q. What room is that?

"A. My bedroom.

"Q. Okay. Your daughter leaves the bedroom. What happens next?

"A. She goes back and gets [the victim].

"Q. Okay. And does she bring [the victim] to you?

"A. She brings her to the door.

"Q. Then what happens next?

"A. Then [the victim] comes on in my bedroom.

"Q. And are you standing or sitting or where are you?

"A. By that time I had raised up out the bed and sit up on the side of the bed.

"Q. Describe for the ladies and gentlemen of the jury [the victim]'s appearance at that time. What did she look like?

"A. She was crying and very upset.

"Q. Okay. Did you have conversation with her?

"A. Yes, I did.

"Q. Did you ask her—

"A. I asked her, I told her [the victim], what is wrong with you.

"At first she wouldn't say anything. And then I said whatever, if it is wrong or right, whatever, you can tell grandmother. And then I took her and set her on my lap.

"Q. Was she still crying at this point?

"A. Yes, she was.

"Q. Okay. What happened?

"A. Then I asked her what was wrong, and she said that—

"MR. ADAMS: Objection.

"THE COURT: Overruled.

"Q. Please continue.

"A. She said that she was in the building and she had asked for the key to go to the bathroom, and that Mr. James Chappell was, I guess, the security guard on at that time. I do not know. But he led her down the hall and she had asked for the key but instead of him giving her the key he takes her in the security office room and he takes her clothes off of her—

"MR. ADAMS: Objection.

"THE COURT: Overruled.

"Q. Please continue.

"A. And she said that he took her clothes off of her.

"Q. All right. Did she tell you anything else?

"A. No.

"Q. Okay. She told you that the defendant took her clothes off?

"A. Yes.

"Q. Is that the last thing she told you?

"A. And that he had taken his off.

"Q. And then what happened after that? Did she tell you?

528

"A. And she said that he had took her clothes off and that he had took his penis and stuck it in her vagina.

"Q. Now, ma'am, what you use the term penis and the term vagina, is that what she told you that night?

"A. Yes, she did.

"Q. She didn't use any other slang word?

"A. No."

The prosecutor asked the victim why she did not tell her aunt in Cleveland about the incident. She responded that she did not believe that her aunt would believe her.

It is not uncommon for children to be dismissed as telling unfounded stories when they relate stories of such magnitude to an adult relative, and children can always sense the reaction of adults to their stories. Therefore, based on the totality of the circumstances (the occurrence of the incident in Cleveland, the child's mistrust of her aunt, and the child's return to an environment where she felt more comfortable without much lapse of time), we cannot conclude that the child did not remain in the state of excitation when she told the story of her encounter with appellant to her grandmother. *State v. Duncan, supra;* see *Presley v. Presley* (1990), 71 Ohio App.3d 34, 593 N.E.2d 17; see, also, *State v. Fox* (1990), 66 Ohio App.3d 481, 585 N.E.2d 561 (seven-year-old child's statement one day after the alleged rape was admitted as excited utterance); *State v. Barton* (1991), 71 Ohio App.3d 455, 594 N.E.2d 702 (three-hour lapse of time did not render the statement inadmissible.)

Since the victim remained in an agitated state upon her return when she told her story to her grandmother, her statement is admissible as an excited utterance under Evid.R. 803(2). See *State v. Wallace* (1988), 37 Ohio St.3d 87, 524 N.E.2d 466; *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220. Appellant's argument is overruled.

Appellant further argues that the social worker's testimony of what the victim told her was also inadmissible hearsay. The state countered by arguing that the statements made to the social worker fall within the medical diagnosis and treatment exception to the hearsay rule. The state in support of its argument cited this court's decision in *State v. Shepherd* (July 1, 1993), Cuyahoga App. No. 62894, unreported, 1993 WL 243071, citing *State v. Duke* (Aug. 25, 1988), Cuyahoga App. No. 52604, unreported, 1988 WL 88862, and *State v. Cottrell* (Feb. 19, 1987), Cuyahoga App. No. 51576, unreported, 1987 WL 6799. The state quoted this court's holding in *Shepherd* that "this court has consistently held that a young rape victim's statements to social workers, clinical therapists

and other medical personnel are admissible under Evid.R. 803(4)." We note that the cases cited by the *Shepherd* court were decided before *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220. However, we recognize the need to explain our reasoning in *Shepherd* to avoid an unwarranted broad expansion of the Evid.R. 803(4) hearsay exception.

We begin with the provisions of Evid.R. 803(4) concerning statements made for purpose of medical diagnosis or treatment. It states as follows:

"Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

It is settled law in Ohio that statements made for the purposes of medical diagnosis or treatment are admissible under Evid.R. 803(4). See *State v. Boston, supra; State v. Dever* (1992), 64 Ohio St.3d 401, 596 N.E.2d 436; *Scott v. Campbell* (1961), 115 Ohio App. 208, 20 O.O.2d 298, 184 N.E.2d 485; *Cleveland Ry. Co. v. Merk* (1932), 124 Ohio St. 596, 180 N.E. 51.

In *State v. Boston, supra,* the Ohio Supreme Court held that:

"Evid.R. 803(4) extends the common-law doctrine to admit statements made to a physician or medical attendant without regard to the purpose of the examination or the need for the patient's history. In other words, the patient's statements are admissible even though made to a physician consulted for the purpose of enabling the doctor to testify and even when no treatment is contemplated. Staff Note to Evid.R. 803(4).

"Evid.R. 803(4), effective July 1, 1980, permits the admission of three types of patient statements: (1) medical history, (2) past or present symptoms, pain or sensations, and (3) description of the inception or general character of the cause or external source of the disease or injury. *These statements, to be admissible, must be made by the patient for purposes of medical diagnosis or treatment. Furthermore, all three types of statements are admissible only where they are ' * * * reasonably pertinent to diagnosis or treatment.'* " (Emphasis added.) 46 Ohio St.3d at 121, 545 N.E.2d at 1233.

The *Boston* court continued, 46 Ohio St.3d at 122–123, 545 N.E.2d at 1234–1235:

"Another dilemma in applying Evid.R. 803(4) is whether a statement by a child to a psychologist, counselor, social worker, minister, etc., is admissible under the medical diagnosis or treatment exception.

"In [*State v.*] *Eastham* [ (1988), 39 Ohio St.3d 307], at 312, 530 N.E.2d [409], at 413, Justice [Herbert R.] Brown noted in his concurrence that the Staff Note to

Evid.R. 803(4) stated that the rule was derived from the assumption that a person will be truthful about his *physical* condition to a *physician* because of the risk of harmful treatment resulting from untruthful statements. The concurrence concluded that '[s]tatements made during the course of treatment for a mental health condition, however, are not imbued with the same aura of reliability [as a patient's statements to his physician]. In such situations, a patient's veracity, perception, memory or narrative ability may be impaired.' *Id.* at 312, 530 N.E.2d at 413–414.

"Evid.R. 803(4) provides that the statements must be made ' * * * for purposes of *medical* diagnosis or treatment * * *.' (Emphasis added.) In the case before us, Dr. Lord did not 'treat' Cynthia. Further, Dr. Lord is a psychologist—not a medical doctor—and the definition of 'psychologist' found in R.C. 4732.01(A) does not include medical training. See, also, R.C. 4731.09. Under the circumstances, would Dr. Lord's testimony be admissible pursuant to Evid.R. 803(4)?" (Emphasis and bracketed material *sic.*)

Thus, as did the *Boston* court, we ask under the circumstances of this case would the social worker's testimony be admissible under Evid.R. 803(4)? We think not. It is our opinion that the state misunderstood the Ohio Supreme Court's decision in *Dever, supra. Dever* did not challenge the *Boston* court's holding that the Evid.R. 803(4) exception to the hearsay rule is limited to statements made for purposes of medical diagnosis or treatment. *Dever* held the following, 64 Ohio St.3d at 413, 596 N.E.2d at 445–446:

"In applying our holding to the facts of this case, we find that the trial court properly evaluated the circumstances accompanying the making of the child's statements. *Since there is insufficient reason to doubt that the statements were made for purposes of medical diagnosis or treatment, the trial court did not abuse its discretion in finding that the statements were admissible pursuant to Evid.R. 803(4).* Neither Evid.R. 803(4) nor 102 requires exclusion of the child's statements from the evidence, when as here the record supports the trial court's determination that the requirements of Evid.R. 803(4) were met." (Emphasis added.)

The *Dever* court modified *Boston* to the extent that it allows a child's statement to a doctor to come under diagnosis or treatment even when the child's initial motivation was not to seek treatment from the doctor. *Id.* at 410, 596 N.E.2d at 443–444.

We would not adopt a rigid rule as to what constitutes "diagnosis and treatment" or limit diagnosis and treatment to licensed physicians, as such a narrow holding would undercut the function of nurses, psychiatrists, therapists, and various individuals who treat victims of sexual abuse. We are equally not

prepared to hold that a social worker by merely being a social worker is automatically included in the category of individuals who can render treatment or diagnose sex abuse victims. The inclusion of a social worker into this select group of care providers must depend on her function. Where a social worker's function does not include diagnosis or treatment (whether it be mental or physical treatment of a child sex abuse victim), any statement made to the social worker cannot be admissible under the exception to the hearsay rule in Evid.R. 803(4). Thus, our previous holdings in *Shepherd, supra,* should not be interpreted to create a *per se* rule that all statements made to social workers regardless of their functions qualify under the exception to the hearsay rule in Evid.R. 803(4).

We look to the functions of the social worker in the instant case to determine whether the victim's statement to her could be interpreted as being for diagnosis or treatment. The following colloquy took place between the prosecutor and the social worker:

"Q. Ms. Dixon, whom are you employed by?

"A. The Clark County Department of Human Services.

"Q. In what capacity?

"A. I am an intake social worker.

"Q. And as a—an intake social worker?

"A. Yes.

"Q. What is it that you do?

"A. I am mandated by law to investigate alleged physical, sexual abuse referrals and negligent referrals to insure the safety of the children is met, and also to insure that the child's best interests are met.

"Q. What do you mean by mandated by law?

"A. The law states that we must investigate all referrals that come into our agency.

"Q. All right. Did you have an opportunity to receive a referral with respect to an individual by the name of [the victim's]?

"MR. ADAMS: Objection.

"MR. PARKER: Objection.

"MR. ADAMS: Object to this, Judge.

"THE COURT: Overruled. Go ahead.

"A. Yes, I did.

"Q. Do you recall on what date you received a referral?

"A. Our agency received the referral on July the 6th of 1992.

"Q. All right. Now, a little bit about the protocol once a referral is received by your agency.

"What happens when that referral comes in?

"How does it come in?

"A. Any concerned individual that is concerned about a child or a family can call into our agency, and once we receive the referral a supervisor reads the referral and assigns the case as a priority one, which is an immediate life or death situation to a child, and we have to respond within one hour.

"If the supervisor decides to rate it a priority two, that means the child is still in immediate danger and we must have face-to-face contact with that child within 24 hours.

"A priority three means that the child is still at risk, but we have 48 hours to respond.

"Q. All right. And was this case prioritized?

"A. Yes, it was.

"Q. By whom?

"A. By my supervisor.

"Q. Who is?

"A. Linda Myrotti.

"Q. What priority was this—

"MR. ADAMS: Objection.

"MR. PARKER: Objection.

"THE COURT: Overruled. Go right ahead.

"A. A priority three.

"Q. Now, that indicates that you have to make contact within what amount of time?

"A. 48 hours.

"Q. And did you?

"A. Yes, I did.

"Q. What did you do?

"A. I called [the victim's] mother, on July the 7th at 8:45 a.m. and scheduled an office interview with [the victim] for July the 8th at 1:30.

"Q. Okay. And did mom bring [the victim] in?

"A. Yes, she did.

"Q. Did you talk to [the victim]?

"A. Yes, I did.

"Q. Now, with respect to talking to [the victim], where did you do this?

"A. I did it at our agency in Rochelle Sutherland's, a supervisor's office.

"Q. Who is in this office with you and [the victim]?

"A. It was just [the victim] and I.

"Q. Just [the victim] and you?

"A. Yes.

"Q. Did you use any—other than talking with her did you use any props or anything, any assistance to help you communicate with [the victim]?

"MR. ADAMS: Objection.

"MR. PARKER: Objection, your Honor.

"THE COURT: Sustained.

"Q. During the course of this discussion with [the victim] did she do any writing or drawing?

"A. Yes, she did.

"Q. Okay. What was she writing on?

"MR. ADAMS: Objection to this.

"THE COURT: What is she writing on?

"MR. KOLASINSKI: Let me rephrase the question, your Honor.

"Q. Did you give her something to use to help you in your discussion with her?

"A. Yes, I did.

"Q. Okay. And what did you give her?

"A. Anatomical drawings.

"Q. Drawings?

"A. Yes.

"Q. Okay. What were these anatomical drawings of?

"A. Of a female child and an adult male.

"Q. Now, at what point in your interview did you use these drawings?

"A. After [the victim] and I—

"MR. ADAMS: Object to this, Judge.

"MR. PARKER: Objection to all of this.

"THE COURT: All right. Overruled. Let's go on with this.

"A. Initially when I brought [the victim] in for the interview we just sat down and talked for awhile to get her comfortable with the setting. And afterwards I asked [the victim] if she knew what she was here for, for the interview, and she stated yes. And she went on to explain to me why she was there.

"Q. What did she tell you?

"MR. PARKER: Objection.

"THE COURT: Overruled.

"A. She stated that James had hurt her."

■ A careful review of the record shows that the function of the social worker in the instant case is neither diagnosis nor treatment. She just wanted to determine if further investigation was warranted after getting the child's statement. Those not allowed or certified as medical experts or clinical therapists cannot be accorded as a matter of law the privilege of giving medical diagnosis or treatment for evidentiary purposes just because they come in contact with children. The trial court's admission in the instant case of the social worker's testimony is in error.

■ The next issue is whether appellant suffered any prejudice. Admission of inadmissible hearsay is analyzed in the same manner as the admission of any other evidence at trial. For the purposes of prejudice, a reviewing court looks at the evidence in relation to the entire trial to determine its effect. The most difficult problem associated with admission of out-of-court statements is a possible violation of the defendant's constitutional right of confrontation.

The defendant's right of confrontation is provided in the Sixth Amendment to the Constitution of the United States, which states that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." See *Pointer v. Texas* (1965), 380 U.S. 400, 403, 406, 85 S.Ct. 1065, 1067–1068, 1069, 13 L.Ed.2d 923, 926–927.

The United States Supreme Court addressed the relationship between the Confrontation Clause and an out-of-court statement admitted during trial in *California v. Green* (1970), 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497. It concluded:

*"Viewed historically, then, there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as*

*long as the declarant is testifying as a witness and subject to full and effective cross-examination.*

"This conclusion is supported by comparing the purposes of confrontation with the alleged dangers in admitting an out-of-court statement. Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

"It is, of course, true that the out-of-court statement may have been made under circumstances subject to none of these protections. *But if the declarant is present and testifying at trial, the out-of-court statement for all practical purposes regains most of the lost protections.* If the witness admits the prior statement is his, or if there is other evidence to show the statement is his, the danger of faulty reproduction is negligible and the jury can be confident that it has before it two conflicting statements by the same witness. Thus, as far as the oath is concerned, the witness must now affirm, deny, or qualify the truth of the prior statement under the penalty of perjury; indeed, the very fact that the prior statement was not given under a similar circumstance may become the witness' explanation for its inaccuracy—an explanation a jury may be expected to understand and take into account in deciding which, if either, of the statements represents the truth.

"*Second, the inability to cross-examine the witness at the time he made his prior statement cannot easily be shown to be of crucial significance as long as the defendant is assured of full and effective cross-examination at the time of trial.*" (Footnote omitted; emphasis added.) See, also, *Mattox v. United States* (1895), 156 U.S. 237, 242–243, 15 S.Ct. 337, 339–340, 39 L.Ed. 409, 411; *Ohio v. Roberts* (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597.

In the instant case, the victim testified at trial and was subjected to full cross-examination by appellant's trial counsel before the jury. We cannot share appellant's view that the out-of-court statements testified to by the social worker are any more damaging than the testimony of the declarant herself at trial.

Thus, we hold the admission of the social worker's testimony to be harmless and overrule appellant's first and third assignments of error.

### III

Appellant argues in his second assignment of error that the trial court erred by allowing a state's witness to testify as to the veracity of the child's

statements. Appellant argues unpersuasively that admission of Dr. Kennington's testimony concerning the truthfulness of the child's statements was in error because experts are prohibited from stating an opinion of the veracity of the statements of another individual.

 It is settled law that the judge of the veracity of a witness is solely the trier of facts. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. An expert is prohibited from invading the territory of the jury by interjecting his opinion concerning the truthfulness of the statement of any witness. That could be very prejudicial and reversible error. *State v. Boston, supra.* But in the instant case a careful examination of the record indicates that appellant suffered no prejudice that he did not bring upon himself.

Kennington during cross-examination testified in favor of the defense, and to its delight, that the child's injury could have been caused by something other than sexual contact. Counsel did not stop at that as is shown in this colloquy between appellant's trial counsel and Kennington:

"Q. Doctor, you have indicated that what you observed in her vaginal area could have been caused, the tearing and whatever else you saw, could have been caused by things other than sexual assault, isn't that right?

"A. That's correct.

"Q. Could have been caused by the child herself.

"Could it have been caused by a fall, playground equipment, things of that nature?

"A. That's correct.

"Q. And it is also a fact, is it not, Doctor, that you have no way of knowing whether or not the history that you got was truthful or not?

"A. I guess I would have to disagree with that statement.

"Q. You have no idea if what was related to you by the little girl as to what happened, you have no way of knowing whether that is the truth or is not the truth. Isn't that a fair statement?

"A. No, I wouldn't say that it is. I think I can have an idea and a pretty good opinion about the truthful nature of her statement. It is not like in a laboratory where you can document something a hundred percent, but I have dealt with a lot of these children and I usually have a pretty comfortable opinion about whether or not the child is telling the truth.

"Q. You did assume that she was telling you the truth?

"MR. KOLASINSKI: Objection.

"THE COURT: Overruled.

"Q. In making your findings?

"You assumed she was being truthful. Is that a fair statement?

"A. I would say that the way—

"Q. It is a simple question, Doctor. Yes or no.

"MR. KOLASINSKI: Objection.

"THE COURT: Overruled.

"A. If I am allowed to respond in my own way here.

"THE COURT: Go ahead and respond.

"A. I would say that the manner in which [the victim] related her story to me rings true, is consistent with a child who has been assaulted.

"Q. Now, you did not notice any other trauma on this child, right?

"A. No. That's correct."

The record shows that the objections came from the state. Appellant never objected to the answers that he invited or even asked the court to strike the answers as being unresponsive. The rule of invited error remains true in this case as in all cases. A party who invites an error at trial has no one to blame but himself and cannot seek solace in the appellate court. See *Lester v. Leuck* (1943), 142 Ohio St. 91, 26 O.O. 280, 50 N.E.2d 145; *State v. Kniep* (1993), 87 Ohio App.3d 681, 622 N.E.2d 1138. Common sense tells us that one who shoots himself in the foot cannot stop the shooting or its effect after the fact. The law takes the same approach when one invites an error. It was, therefore, not an abuse of discretion for the trial court to refuse to give a curative instruction or grant a mistrial. *State v. Hill* (1987), 37 Ohio App.3d 72, 523 N.E.2d 894.

Appellant's second assignment of error is overruled.

## IV

Appellant in his fourth and fifth assignments of error argues that there was insufficient evidence to convict him and also that the verdicts are against the manifest weight of the evidence. We disagree on both counts. On a challenge to the sufficiency of the evidence, the relevant inquiry is whether after viewing the entire evidence admitted at trial in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant was guilty. *Jackson v. Virginia; State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.

In the instant case, the state presented the victim, who testified about her ordeal and also identified appellant as the culprit. Other witnesses also testified.

There is nothing shown by appellant that would convince us that the jury should not have found him guilty.

We also do not find anything in the record to show that the jury lost its way. The jury listened to the testimony of witnesses to both parties and observed their demeanors. It was in a better position that we are to judge the credibility of those witnesses, and it did. See *State v. DeHass, supra; State v. Davis* (1988), 49 Ohio App.3d 109, 550 N.E.2d 966; *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717. Having found no error in the verdict of the jury to convict and no error in the trial court's acceptance of the verdict, we overrule appellant's assignments of error and affirm the trial court's judgment.

*Judgment affirmed.*

NAHRA, C.J., and WEAVER, J., concur.