JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Glen Rice appeals from his convictions after a jury trial on five counts of forcible rape of a minor. Four of the counts indicated the offense was perpetrated on a child under the age of ten.
 {¶ 2} Appellant raises five challenges to his convictions. His first three concern the trial court's evidentiary decisions made during his trial. He asserts the testimony of the victim's mother and of a social worker concerning statements made to them by the victim constituted inadmissible hearsay, but, on the other hand, the trial court improperly excluded prior "inconsistent" statements made by the victim to adults. Appellant further asserts the trial court gave an improper instruction to the jury. Finally, appellant claims his convictions were unsupported by the weight of the evidence.
 {¶ 3} This court, however, has thoroughly reviewed the record and disagrees with appellant that any reversible error occurred during his trial. Accordingly, his convictions are affirmed.
 {¶ 4} Appellant's convictions result from his relationship with the victim, his biological daughter, who was born prematurely on June 29, 1997. The difficult circumstances of the victim's birth afflicted her with the permanent physical disabilities of cerebral palsy, asthma, and a weakened constitution.
 {¶ 5} Over the course of her young life, the victim spent months in the hospital. She had limited voluntary control of her body; as a consequence, she required aid in performing the most basic daily tasks, including sitting, bathing, and elimination. By the age of nine months, moreover, she could eat so little that a gastrointestinal tube had to be placed in her stomach for purposes of maintaining her proper nutrition. In short, the victim required intensive personal care.
 {¶ 6} The victim however had no mental disabilities. Indeed, she performed well academically and had no difficulty expressing herself. Additionally, she was described as a beautiful child.
 {¶ 7} The victim's mother, "D," gave her primary care during the day. Since D worked away from the home at night, she depended upon appellant, whom she had married approximately a year after the victim's birth, to care for the victim almost equally. D trusted appellant, often "bragging"[1] to her co-workers about his dedication to the nurture of the victim.
 {¶ 8} In August 2001, while assisting the four-year old victim to the toilet, D noticed she seemed "upset" and irritable. She asked the victim why she was "fidgeting." The victim "complained * * * that her dad hurt her koo-koo. And her koo-koo is what [D] raised all [her] girls to say as * * * their vagina." D hesitated before inquiring how he had done that. The victim responded that "he stuck his finger in her koo-koo."
 {¶ 9} D quickly removed the victim to another room. She presented a baby doll to her and told her to "show" D. The victim placed her finger up under the doll where the vagina would be.
 {¶ 10} At that, D confronted appellant with the victim's complaint. Appellant seemed "nervous"; he refused to remain still, walked away from D while he denied hurting the victim, and then, when D began to cry, became teary himself. He agreed the victim should be taken to her pediatrician based upon her distress.
 {¶ 11} Appellant was present in the examining room during the victim's physical examination by the doctor. The doctor found nothing conclusive. D, nevertheless, contacted the county department of Children and Family Services, which, on August 16, 2001, assigned the matter to social worker Patricia Altier.
 {¶ 12} Altier went to the victim's home to conduct the preliminary interview. After becoming acquainted with the victim by joining her in coloring, Altier asked the victim if she wanted to call someone on her play telephone. The victim declared she would call her doctor. During this play conversation, the victim told her doctor that "someone touched [her] kook." Altier asked her who had done that, and the victim stated her "dad;" after making this statement, the victim made the words into a chant.
 {¶ 13} The victim's actions caused Altier to draw a female stick figure, which she presented to the victim for illustration. As Altier asked for them, the victim identified correctly parts of the body for the figure. The victim "pointed to the area between the stick figure's legs as her kook." When Altier asked her what her dad had touched her with, the victim could not respond.
 {¶ 14} Altier then drew a male stick figure. Once again, the victim could correctly point to parts of the body. This time, when Altier asked what her dad touched her with, the victim pointed to the middle of the stick figure's legs. As the victim now was becoming tired and upset, she refused further attempts at conversation.
 {¶ 15} Five days later, Altier arrived for an interview with another family member. Altier spoke to the victim briefly. Although the victim remembered they had "talked about her dad touching her kook," she refused to cooperate with any attempt to gain additional information; she "kept shoving" away the anatomically-correct picture of a male Altier placed in front of her.
 {¶ 16} Altier spoke to appellant as part of her investigative process. Upon being informed appellant bathed naked with the victim, Altier suggested he wear bathing trunks since the victim was getting older. Appellant's reaction showed he "thought that was a very strange request" and one he seemed unwilling to accept. Appellant, however, agreed to "take a sex offender assessment." Altier subsequently transferred the case to another social worker in the "sex abuse" unit, Lynetric Rivers, for ongoing evaluation.
 {¶ 17} Rivers thereafter communicated with and visited appellant's household at least monthly. When she spoke to appellant, she inquired about his referral for an assessment. Appellant never followed through, despite these constant reminders.
 {¶ 18} Over these months, D occasionally noticed the victim's clitoris was swollen, or she displayed a rash between her thighs. Each time, D made an appointment with the victim's pediatrician; each time, after a cursory examination, the pediatrician presented a reasonable explanation for the unusual physical condition.
 {¶ 19} By the late summer of 2002, the victim was five years old. She suffered a severe gastrointestinal attack which required a week of hospitalization. While awaiting the victim's discharge from the facility, D initiated a conversation with the victim about sexual matters.
 {¶ 20} Referring to a sexual organ like a girl's "koo-koo," D asked the victim if she knew what men had. The victim responded affirmatively, describing it as a "tail." D asked the victim if anyone had ever hurt her with one. The victim answered yes, and identified appellant as the one who had done so.
 {¶ 21} Not long thereafter, appellant entered the room. Upon seeing him, the victim excitedly blurted out, "Daddy, I told Mommy you hurt me with the —," glanced back at D, then stopped.
 {¶ 22} This episode prompted D to contact Rivers. After informing Rivers of the victim's most recent revelation, D also confronted appellant. Appellant "started crying and he fell on the ground." Although D also was highly upset, she eventually arrived at a point at which she could listen to him. Appellant ultimately agreed to do whatever Rivers suggested, and acknowledged that he was "going to get some help," because he was "sick."
 {¶ 23} D demanded appellant apologize to the victim. Together, they went to her room, where appellant stated he was "sorry [he] hurt [her] koo-koo." He promised "Daddy's not going to hurt your koo-koo no more." At D's prompting, appellant picked up the victim to give weight to his words. The victim "froze" as though she were frightened, attempted to twist away, and then "took a breath and she looked up at him and she said, And Daddy, you're not going to hurt me with that big thing, are you?"
 {¶ 24} With trepidation, D asked the victim what color the "big thing" was. When the victim said "purple," D's fear was realized: that was the color of the electronic dildo appellant used on D during sexual encounters. D at that point told appellant he had to leave the home.
 {¶ 25} Altier conducted a third interview with the victim shortly thereafter, on September 20, 2002; the victim remembered their previous meetings. Altier provided the victim with paper and asked her to whom she wanted to write. The victim told her, "my dad." Altier indicated she would write the words for the victim; the victim stated, "I want to tell dad to stop touching my koo-koo."
 {¶ 26} This time, when Altier presented her with anatomically-correct pictures, the victim indicated appellant had placed his penis "inside and it hurt." She further indicated she was mad at him because he had "yelled at her, he told her to shut up and was mean to her, and * * * because he took her dress off." In addition, the victim described how appellant also had "put his finger in her butt," which also "hurt." Prior to the conclusion of the session, the victim licked the penis area on the picture of the male "because that's what [her] dad [did] to her, he ma[de her] put [her] tongue on his tail."
 {¶ 27} In October 2002, appellant was indicted on five counts of rape. The first related to the August 2001 incident and contained an element of force; the next four contained furthermore clauses that set forth the age of the victim as under ten.[2]
 {¶ 28} After appellant's departure from the home and his arrest on the foregoing charges, D noticed the victim began sleeping more soundly, sang and played more often, and generally seemed "relieved."
 {¶ 29} Appellant's case proceeded to a jury trial. The jury ultimately found appellant guilty of each offense; appellant received five consecutive sentences of ten years to life imprisonment for his convictions.
 {¶ 30} Appellant presents five assignments of error. Since they concern a similar issue, the first three will be combined for ease of discussion; they are set forth verbatim as follows:
 {¶ 31} "I. The trial court allowed impermissible hearsay testimony from alleged victim's mother in violation of Ohio Rule of Evidence 803(2), the Fifth, Sixth, Eighth and Fourteenth Amendment to the U.S. Constitution, and Article I, Section 9 and 16 of the Ohio Constitution.
 {¶ 32} "II. The trial court allowed impermissible hearsay testimony from social workers in violation of Evidence Rule 803(4).
 {¶ 33} "III. The trial court erred by sustaining the prosecutor's objection to questions and testimony reflecting the prior inconsistent statements made by the alleged victim pursuant to Evidence Rule 806."
 {¶ 34} In all of these assignments of error, appellant challenges evidentiary rulings made by the court during his trial. The admission or exclusion of evidence, however, is a matter left to the trial court's sound discretion and will not be disturbed absent an abuse of that discretion. State v. Lundy (1987), 41 Ohio App.3d 163, 169.
 {¶ 35} Appellant first challenges the trial court's decision, pursuant to Evid.R. 803(2), the "excited utterance" exception to the hearsay rule, to permit D to testify about statements made to her by the victim. Appellant asserts the statements lacked the context of a time frame for the "startling event," so they could not meet the test of admissibility. This court disagrees.
 {¶ 36} There is no per se length of time following the occurrence after which a statement may no longer qualify as an excited utterance.State v. Taylor (1993), 66 Ohio St.3d 295, 303; see, also, State v.Duncan (1978), 53 Ohio St.2d 215, 219. Moreover, in the case of young children, the requirements for admission have been liberalized on the principle that these declarants have limited reflective powers and are likely to remain in a state of nervous excitement longer than would an adult. State v. Taylor, supra.
 {¶ 37} In this case, the four-year-old victim made the first statement when she was on the toilet. She obviously was uncomfortable during the process, and her discomfort prompted her to complain that appellant had "stuck his finger" inside her. The circumstances thus indicated both the freshness of the event and the fact that the victim remained under its stress. State v. Sanders (June 21, 1990), Cuyahoga App. No. 56977.
 {¶ 38} Similarly, the record reflects the victim made the other statements with spontaneity under circumstances that established the requisite time frame and mental state to qualify under this exception to the hearsay rule. State v. Walker, Cuyahoga App. Nos. 79586, 79695, 2002-Ohio-3265. Consequently, the trial court properly admitted the statements. In re Michael (1997), 119 Ohio App.3d 112.
 {¶ 39} Appellant next challenges the trial court's decision, pursuant to Evid.R. 803(4), the "medical treatment" exception to the hearsay rule, to permit Altier to testify about statements made to her by the victim. Appellant asserts since Altier did not function as a medical person, the statements were inadmissible. Once again, this court disagrees.
 {¶ 40} Altier stated that her investigation of allegations of sexual abuse is primarily for the purpose of determining whether "medical attention" or "psychological help" is indicated for the victim. She stated she cannot make an assessment of the services that might be necessary without conducting interviews. She further indicated she could not label the victim's accounts "substantiated" after the initial interviews, but the "red flags" she noted caused her to refer the case for further management; subsequent interviews, however, caused her to refer the victim for "sex abuse" treatment at a facility that specialized in it, viz., the "Care Clinic at UH." Since Altier provided the requisite basis for the admissibility of the evidence, the trial court did not abuse its discretion in this case. State v. Dever (1992),64 Ohio St.3d 401, 414; State v. Kurpik, Cuyahoga App. No. 80468, 2002-Ohio-3260; State v. Chappell (1994), 97 Ohio App.3d 515, 531.
 {¶ 41} Appellant lastly challenges the exclusion of testimony from D concerning statements made by the victim to "University Hospital." Appellant asserts the statements implicated D's eldest son as the possible perpetrator rather than himself, and thus qualified as "inconsistent" pursuant to Evid.R. 806. Appellant's challenge is rejected.
 {¶ 42} The record reflects the statements were not made to D, but, instead, to Lauren McAliley, a University Hospital pediatric nurse practitioner. The record further reflects that McAliley testified she asked the victim if "anyone else had ever touched her koo-koo," a question to which the victim answered affirmatively, and added that her brother "Terry" had.
 {¶ 43} Clearly, the victim's statement that another perpetrator may have abused her was neither inconsistent with her previous declarations about appellant, nor inappropriately excluded by the trial court. Consequently, appellant's assertion has no merit.
 {¶ 44} For the foregoing reasons, appellant's first, second, and third assignments of error are overruled.
 {¶ 45} Appellant's fourth assignment of error states:
 {¶ 46} "IV. The trial court erred when it mistakenly instructed the jury that rape involved sexual contact, not sexual conduct[,] for counts Two through Five."
 {¶ 47} Appellant argues the trial court failed to accurately state the elements of rape when instructing the jury with regard to counts two through five of his indictment.
 {¶ 48} In making this argument, appellant must acknowledge the jury properly was instructed on count one, and, further, appellant must assert the trial court's failure amounted to plain error since defense counsel raised no objection to the instructions.
 {¶ 49} Conversely, in considering appellant's argument, this court must view the instructions in the context of the overall charge, and must remain mindful that "the plain error rule is * * * applied with utmost caution and invoked only under exceptional circumstances * * *." Statev. Cooperrider (1983), 4 Ohio St.3d 226, citing State v. Long (1978),53 Ohio St.2d 91. A review of the record pursuant to these standards renders appellant's argument without merit.
 {¶ 50} The trial court accurately set forth the elements of count one, specifically stating the offense required sexual conduct, and thenimmediately followed with:
 {¶ 51} "Before you can find the defendant guilty under counts two, three, four and five, and/or five, you must find beyond a reasonable doubt that during August of 2002, and in Cuyahoga County, Ohio, the defendant engaged in sexual contact with Jane Doe, not his spouse, whose age at the time of the said sexual conduct was under 13 years * * *. (Emphasis added.)
 {¶ 52} The trial court thereupon accurately distinguished sexual conduct from sexual contact.
 {¶ 53} Later, the trial court gave an instruction on the lesser offense of gross sexual imposition. It differentiated this offense by stating it was "distinguished from rape in that [it] involves sexual contact as opposed to sexual conduct." (Emphasis added.) Those two legal terms at that point again were defined for the jury. During its subsequent deliberations, the jury presented no questions relating to these differences.
 {¶ 54} Viewed in context, therefore, it is impossible to declare the trial court's single misstatement during its instructions to the jury amounted to plain error. State v. Price (1979), 60 Ohio St.2d 136, paragraph four of the syllabus. Appellant's fourth assignment of error, accordingly, also is overruled.
 {¶ 55} Appellant's fifth assignment of error questions:
 {¶ 56} "V. Whether the guilty verdicts was (sic) against the manifest weight of the evidence."
 {¶ 57} Appellant argues the evidence cannot support his convictions, essentially on the basis that the victim's descriptions of the several sexual acts were uncorroborated. Appellant appears to posit that without medical signs of trauma, the disclosures of such a young child lacked reliability pursuant to the guidelines set forth in Statev. Mattison (1985), 23 Ohio App.3d 10. Appellant's argument is unpersuasive.
 {¶ 58} In Mattison, this court suggested several factors should be considered in reviewing whether a jury's decision is against the manifest weight of the evidence. However, the stated factors were merely "guidelines" rather than "hard and fast rules."
 {¶ 59} Moreover, since that decision, the Ohio Supreme Court has determined that the relevant test to be applied was set forth earlier by the appellate court in State v. Martin (1983), 20 Ohio App.3d 172. SeeState v. Thompkins, 78 Ohio St.3d 380, at 387, 1997-Ohio-52. Thus, this court must determine whether in resolving any conflicts in the evidence, the jury "clearly lost its way," creating "a manifest miscarriage of justice." This case does not approach that standard.
 {¶ 60} The pediatric nurse practitioner testified that the absence of physical signs of sexual trauma in a young child is not unusual. She explained that their tissues have an elasticity and an ability to heal that may preclude objective observation, depending on the timing and thoroughness of the medical examination. D, however, testified that after the victim's initial disclosure, she occasionally observed swelling and redness in the victim's genital area.
 {¶ 61} The victim, moreover, gave consistent versions of the acts perpetrated upon her to each of the adults who questioned her. Her sexual knowledge seemed to have increased over the year between the first disclosure and the next ones. Additionally, the circumstances that surrounded her disclosures indicated the victim lacked either a reason or the ability to lie about the incidents.
 {¶ 62} Appellant's evidence, on the other hand, lacked credibility. His attempts to discredit D seemed contrived, since he could provide no motive for D to accuse him of "nasty" acts with the victim. During his testimony on cross-examination, his best explanation for the victim's disclosures was that she developed "confusion" after observing him engage in sexual intimacies with D. Subsequently, however, he unguardedly described the victim not as a baby, but, rather, as his "little lady;" he appeared to flounder when he realized the implication of what he had said.
 {¶ 63} Based upon the record, the jury acted well within its prerogative in believing the state's witnesses rather than accepting appellant's weak attempt to discount the victim's disclosures. The verdicts, therefore, are not against the manifest weight of the evidence. State v. Grahek, Cuyahoga App. No. 81443, 2003-Ohio-2650; Statev. Byrd (Feb. 21, 2002), Cuyahoga App. No. 79661; State v. Wellman (May 18, 2000), Cuyahoga App. No. 76219; State v. Sanders, supra.
 {¶ 64} Accordingly, appellant's fifth assignment of error also is overruled.
 {¶ 65} Appellant's convictions are affirmed.
Judgment affirmed.
James J. Sweeney and Colleen Conway Cooney, JJ., concur.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
[1] Quotes indicate testimony given by a witness at appellant's trial.
[2] The indictment also contained five sexually violent predator specifications that the state dismissed after appellant's trial.