JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Grady Krzywkowski ("defendant") appeals from the judgment of the trial court which, after a jury trial, found him guilty of four counts of rape and two counts of gross sexual imposition. For the reasons set forth below, we affirm the judgment of the trial court.
 {¶ 2} The grand jury indicted the defendant on eight counts, including three counts of rape of his minor daughter, two counts of rape of his minor son, and one count of rape of his other minor son, all in violation of R.C. 2907.02; one count of gross sexual imposition of his minor daughter, and one count of gross sexual imposition of his minor son, both in violation of R.C. 2907.05. The defendant pleaded not guilty and the matter proceeded to a jury trial on September 6, 2001.
 {¶ 3} At trial, the prosecution presented testimony of Sharon Harpel, the foster mother of Kristen and Katelyn ("Katie") Krzywkowski. Sharon testified that in July of 2000, the girls were placed in her therapeutic foster home. At the time of placement, Kristen was five years old and Katie was two. Sharon testified that within weeks of being placed, Kristen frequently disclosed to Sharon incidents of sexual and physical abuse by her father. Sharon testified that when the girls first moved in, they would eat incessantly and hoard food. She testified that Kristen was terrified of not getting enough food.
 {¶ 4} Sharon testified that on one occasion when the girls were playing together in the playroom, she went into the kitchen. She noticed that it had gotten very quiet in the playroom, which was quite unusual for the girls, who generally did not interact well with one another and regularly fought and screamed while playing together. When Sharon entered the room, she found Kristen taking her hands and digging into Katie's diaper and private area as Katie was laying on the floor with her legs spread open in a frog-like position. When Sharon questioned Katie about what she was doing to Katie and why she was doing it, Kristen allegedly responded that when her dad would get mad at them, he would take his four fingers and stick them in Katie's private part or poke them in the butt with toys. Kristen further disclosed that on one occasion, her dad tried to put the "hard part of his body" in her private area and that it hurt.
 {¶ 5} Sharon also testified that Kristen had terrible nightmares every night when she first arrived at the home. When Sharon would go in to comfort Kristen, Kristen stated on one occasion that she was afraid her mother and father were in the closet "waiting to get her." Sharon testified that while Kristen still has nightmares, they are less frequent than they were when she first arrived in Sharon's home.
 {¶ 6} Sharon testified that approximately two weeks after being placed, she took the girls to Cedar Point. She recalled an incident at the pool when Kristen, upon hearing music, went up to the bars attached to the pool used to assist people in getting in and out of the pool, and began "humping" the bars and rubbing up against them. Sharon testified that the behavior mirrored that of a professional dancer. When Sharon tried to redirect Kristen to the pool at that point, Kristen's behavior changed, and she began screaming and yelling while continuing to hump the bars. Eventually, Kristen calmed down at which point Kristen went into a "trans-like" state. Sharon stated that this type of behavior happened on another occasion on the flagpole in Sharon's front yard.
 {¶ 7} Sharon testified that Kristen exhibited behavior that was sexual in nature when she would bathe Kristen. She stated that Kristen would masturbate every time she took a bath, which was almost daily. Sharon further stated that after Kristen was put to bed for the evening, she would often find Kristen masturbating in bed.
 {¶ 8} Sharon testified that when Kristen first arrived at the home and would go to kiss Sharon, she would open her mouth and attempt to stick her tongue in Sharon's mouth. Kristen told Sharon that that was the manner in which her mother and father wanted her to kiss them. Sharon stated that she had to teach Kristen how to kiss her appropriately. She had to further teach Kristen that it was inappropriate for Kristen to attempt to fondle Sharon's breasts.
 {¶ 9} Sharon testified that when the girls were in her home, they initially reacted violently toward the dogs and cats in the house. She recounted that on occasion, Kristen actually became mad, picked the cat up and threw it across the kitchen and against the wall.
 {¶ 10} Sharon testified that she documented Kristen's behavior by taking notes and submitted them to Specialized Alternative for Family and Youth (SAFY), the foster care agency with whom she worked.
 {¶ 11} On cross-examination, Sharon stated that she was testifying from her memory of events that transpired over the last year. She admitted that when the children were brought to her home, she did not observe any physical signs of abuse. She also stated that Kristen made allegations of abuse by her mother and other family members.
 {¶ 12} After being found competent to testify, the state presented Kristen's testimony. She stated that her father did "bad stuff" to her. When questioned further, Kristen testified that her mom and dad frequently locked her in the attic when she was bad. Kristen then stated that she was bad when she didn't listen. Kristen also testified that her father would stick his four fingers in her butt and poke her after pulling her pants down and undressing her. She stated that the first time, he stuck toys, such as play spoons and forks, in her butt and her "crack." She testified that her father stuck his fingers in her private parts on several occasions. She also recounted a story when she witnessed her father take off Katie's diaper and touch Katie's private parts.
 {¶ 13} Kristen stated that her father made her watch a dirty, nasty movie in which the characters stuck their tongues in each other mouths with no clothes on. She stated that her father forced her to watch the movie by herself. She further stated that this was a "vampire" movie. Kristen testified that her father taught her to stick her tongue in somebody's mouth when she kissed them, but she testified that he never kissed her in that way.
 {¶ 14} When asked what her dad did to her that she didn't like, Kristen responded by testifying that on one occasion when she was bad, her father hit her in the head with a wrench and blood got all over her pillow. Kristen stated that she was told by her father to fabricate a story to tell her mother regarding the incident, so that her mother would not find out that her father hit her. Kristen also testified that as a punishment her father tied her up at night and wouldn't release her until the morning. Kristen further testified that her father would pull down Aaron's and Ryan's pants and spank them with a belt when they were bad.
 {¶ 15} Kristen testified that she loved her father, but did not want to live with him again because she did not want him to do bad things to her again.
 {¶ 16} Elizabeth Alexander, the foster mother of Aaron and Ryan, testified for the state on direct examination that when Ryan first came to her home, he was very hyperactive, did not interact well with family members, was obsessed with mutilating insects, walked around naked, tortured kittens that were living at the home, and on one occasion tried to suffocate one of the kittens. Elizabeth also testified that Ryan killed the family's guinea pig by taking a long stick and poking it down the guinea pig's mouth. Elizabeth and Ryan buried the guinea pig and put the dead body in the garbage. Later, Elizabeth found that Ryan had gone through the garbage to find the carcass and was playing with it by repeatedly holding it up in the air and allowing it to hit the concrete.
 {¶ 17} While in foster care, Ryan pulled his pants down and exposed his penis to another foster child in the home. Elizabeth testified that Ryan was physically aggressive and sometimes exhibited violent behavior, particularly when he was angered.
 {¶ 18} Elizabeth testified regarding other behaviors that Ryan had exhibited when he first arrived at her home. She stated that Ryan was obsessed with food. She also testified that Ryan, who very much enjoys drawing and frequently drew pictures of penises and penises ejaculating. Elizabeth testified that Ryan frequently masturbated while bathing and that his genitals were sore from masturbating. Further, she stated that she no longer allowed Ryan to play with toys in the tub because on one occasion, she observed him trying to put a toy in his rectum.
 {¶ 19} Elizabeth testified that while cleaning the kitchen one day, she heard Ryan say to Aaron "let's play spider and fly." A few minutes later, she heard Ryan ask Aaron "does it feel good." At that point, she went to check to see what the boys were doing and found Aaron at the end of the couch on his back with Ryan on top of him. Ryan had his penis in Aaron's mouth and Ryan was moving back and forth in a sexual manner. After Elizabeth explained that that was inappropriate behavior, she asked Ryan what he was doing. Ryan replied that he was playing spider and fly and went on to explain that this was a game he played with his father. Elizabeth then testified that Ryan's behavior has improved significantly since he first arrived in her home.
 {¶ 20} Elizabeth testified with regard to Aaron's behavior in the foster home. She stated that he, too, exhibited inappropriate behavior, such as running through the house naked, bringing attention to his penis and being extremely abusive with the animals. Aaron disclosed sexual abuse to Elizabeth and on one occasion stated that his father put his pee in his butt. Aaron further disclosed that his dad peed in his mouth and put his peanuts in his mouth. Elizabeth testified that she suspected the boys were sexually abused based on these behaviors. In particular, she found the boys hiding under a blanket fondling one another. She also noted that when Aaron would hug her, he would try to touch her breasts.
 {¶ 21} On cross-examination, Elizabeth admitted that she never found any physical signs of abuse, that many foster children exhibit similar behaviors as the Krzywkowski children and that not all of those foster children had been victims of sexual abuse.
 {¶ 22} After the court determined him to be competent, Aaron testified that he knew he was in court to testify because his father had done bad stuff to him. When asked what his father did to him that he did not like, Aaron initially answered that he "forgot." He later testified that while he was living with his father and they were in the kitchen, his father put something white in his "private part that poops" and on his nose. Aaron stated that it hurt a lot and he cried a lot when his dad did that. Aaron was unable to answer why his dad put white stuff on his nose and in his butt, stating "I was being good but he just did it." (T. 1367) Aaron also testified that his dad tried to put his private part in Aaron's mouth.
 {¶ 23} Aaron testified that a "papoose" was something that he was tied up in once, while his father put two socks in his mouth. He was unable to state why his father did this to him. Aaron testified that he did play the spider and fly game with his father, which he did not like. He further testified that he never played the spider and fly game with his brother Ryan.
 {¶ 24} Ryan then testified after being found competent by the trial judge. He stated that he and his father frequently played games together, including video games and "spider and fly." Ryan described the spider and fly game much differently than his foster mother had described it. His description was non-sexual in nature, and he stated that he enjoyed playing the game. He denied that there was another way of playing spider and fly with his dad. He further denied playing spider and fly at Elizabeth's house in the way she had described it.
 {¶ 25} Ryan testified that his dad was a good dad and that he loved him very much. While he admitted to being disciplined once by being "papoosed" and being made to stand in the corner on several occasions, in addition to several other corporal punishment techniques testified to, he denied any allegations of sexual abuse by his father. Ryan stated that his father never put his penis near Ryan's face, that his dad never told him to suck his penis, and that his dad never made Aaron suck on his penis. Ryan stated that he has never seen his father's penis, or any of his father's private parts. Ryan then testified that he did see his dad put white stuff on Aaron's nose and in his butt. He testified that this white stuff was medicine. He stated that he never witnessed his father doing anything bad to his brother or sisters, and if anyone said his father did anything sexual in nature, they were lying. Ryan also stated that he would like to live with his father again.
 {¶ 26} Ryan denied ever trying to suffocate or hurt any of the kittens at Elizabeth's house. He further denied mutilating any insects or butterflies, or drawing pictures of penises while living with Elizabeth.
 {¶ 27} The state presented testimony of Dr. David W. Gemmill, an employee of Mercy Children's Hospital in Toledo, where the children were taken for a sexual abuse evaluation. Dr. Gemmill has specialized in sexual abuse evaluations and treatment for the last fifteen years of his forty-two years in practicing medicine. He testified in regard to the process that is employed when children are brought in for evaluation. Dr. Gemmill explained the children are brought in for an historical evaluation, conducted by either Dr. Gemmill, a nurse practitioner or a trained social worker. In this interview, they collect historical information submitted by the referring agency and glean it from interviews with children and sometimes their caregivers.
 {¶ 28} Dr. Gemmill testified that after historical information is gathered, the next step is to conduct a physical examination to detect any signs of abuse. He described at great length the process for so doing and noted that many times they are unable to detect signs of sexual abuse, unless the abuse happened within a few days prior to the visit. Dr. Gemmill explained that usually children's bodies heal relatively quick.
 {¶ 29} Dr. Gemmill and his staff conducted evaluations and examinations on the Krzywkowski children. He thereafter prepared two reports, one regarding the girls and one regarding the boys.
 {¶ 30} With regard to the girls, Dr. Gemmill testified that Darla Vogelpohl, a nurse practitioner, took the history of Kristen while Sharon was present. Immediately after the history was taken, Darla met with Dr. Gemmill for a briefing prior to Kristen's medical examination. After conducting a medical examination, Dr. Gemmill noted that he did not detect any abnormalities that would indicate physical signs of sexual abuse. After reviewing her historical information and conducting a medical examination, Dr. Gemmill opined that there had been inappropriate contact with Kristen which would indicate sexual molestation and physical abuse. He further testified seventy-five percent of his diagnosis was based on the history that was given to them.
 {¶ 31} With regard to the evaluations and examinations of the boys, Dr. Gemmill testified that after conducting a physical examination, during which he did not find physical signs of sexual abuse, he opined that there was "inappropriate stuff" going on, probably more physical abuse than sexual abuse.
 {¶ 32} Dr. Gemmill testified that Ryan did not offer much in the way of historical information, nor did Elizabeth, who was present at the time of the interview. Dr. Gemmill testified that he conducted the medical examination of Ryan and found folliculitis across his buttocks, which could have been explained by his bed-wetting problem. He further testified that after completing the process with Ryan, there was sufficient information indicating sexual molestation.
 {¶ 33} Dr. Gemmill testified that it is quite common for children to recant allegations of sexual abuse, especially when there is no support coming from the family. He stated that there exists a variety of reasons for a child to recant an earlier allegation of abuse, including when there is little family support or where the child feels as if his "world is tumbling down" because of his or her disclosures.
 {¶ 34} On cross-examination, Dr. Gemmill testified that at the time of his evaluations of the children, he did not have access to any previous medical records of any of the children. He stated that since then, he has not seen any other reports, other than one report from a consultant who examined Kristen for an eye condition. Dr. Gemmill admitted on cross-examination that white medicine called Desitin is frequently used to treat a child who has a rash from bed-wetting, which could possibly explain the testimony that the defendant put white stuff in Aaron's buttocks and his nose.
 {¶ 35} The state then presented the testimony of Diane Marx, an employee of SAFY at the time the Krzywkowski children were placed in foster care. She was assigned to monitor the progress of the children in the foster homes. She stated that certain behaviors of the children were brought to her attention, such as Kristen biting herself, that she was masturbating daily, and that she was having night terrors, and disclosing information indicating that her father had physically and sexually abused her. Upon learning this information, Ms. Marx contacted the county social worker and called the child abuse hotline, at which time the children were taken in for an interview with Julie Prettyman, a social worker for the county in the intake department.
 {¶ 36} The state presented the testimony of Julie Prettyman. Ms. Prettyman stated that her role in the intake department was to investigate specific allegations of sexual abuse of children and to interview the children to assess a child's needs in terms of safety and whether the child will need medical treatment and/or counseling. She testified that she interviewed Kristen and Aaron to assess the need for safety requirements, to assess the allegations, and to determine if any follow-up treatment was necessary for them. Ms. Prettyman stated that during the interview, Kristen disclosed instances of abuse to her by her father. She told Ms. Prettyman that he had locked her in a room, made her sit, stand, squat, clean the walls, and that he had at times penetrated her anus and private part with his fingers. Kristen also told Ms. Prettyman that her dad made her watch dirty movies that were disgusting, he kissed her inappropriately by putting his tongue in her mouth, and that there were times when she saw her parents have sex. Kristen further disclosed that she had witnessed her dad touching her siblings in the same way that she was touched. She disclosed that she had been penetrated and stated "Dad stuck his private in my butt, in my private, and it hurt and it was red and it was hard and it smelled like poop." (T. 1655) At this time, Ms. Prettyman recommended an immediate evaluation of the children.
 {¶ 37} Ms. Prettyman stated that Aaron did not make any disclosures to her regarding sexual abuse when she interviewed him. He did, however, make disclosures regarding physical abuse. Ms. Prettyman testified that, after interviewing both children, she noted that sexual abuse was "indicated."[1]
 {¶ 38} Darla Vogelpohl was called as a state's witness. She testified that, upon taking a history of Kristen, Kristen disclosed several instances of sexual abuse by her father, all of which had been testified to at this point in the trial.
 {¶ 39} The state also presented testimony of expert social worker Cynthia King. Ms. King never interviewed the Krzywkowski children, nor had she ever met them. She testified that there are recognized behavior indicators of children that have been sexually abused, including: bed-wetting, acting out a sexual act with a doll or stuff animal, excessive masturbation, fondling other children, Ms. King also testified that physical signs of sexual abuse are generally only found in twenty to twenty-five percent of children.
 {¶ 40} Ms. King opined that the behaviors exhibited by the Krzywkowski children were consistent with those behaviors that are indicative of sexual abuse. She testified to specific incidents of sexual abuse that had already been testified to at trial by other witnesses for the state.
 {¶ 41} The jury returned a verdict of guilty of four counts of rape and two counts of gross sexual imposition and sentenced him accordingly. It is from this ruling that the defendant now appeals, asserting eight assignments of error for our review.
 {¶ 42} "I. Prejudicial error was committed by the admission of `other acts' testimony in violation of R.C. 2945.59, Evid.R. 404 (b), and Mr. Krzywkowski's rights under Article I, Section 16 of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution."
 {¶ 43} "II. The misconduct of the prosecutor violated Mr. Krzywkowski's rights to a fair trial guaranteed by the due process provisions of Article I, Section 16 of the Ohio Constitution, and the Fourteenth Amendment to the United States Constitution."
 {¶ 44} The defendant contends that the trial court erred by allowing witnesses to testify in regard to instances of corporal punishment allegedly committed by the defendant. Specifically, he avers that this "other acts" testimony was unrelated to the sexual abuse charges for which he was being tried and was therefore unfairly prejudicial. We disagree.
 {¶ 45} Pursuant to Evid.R. 404 (B), evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. See also R.C. 2945.59; State v. Bloom (1988),40 Ohio St.3d 277. Further, other act evidence is admissible if it is relevant to prove an element of the offense. State v. Smith (1990),49 Ohio St.3d 137, 140.
 {¶ 46} The admission of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Therefore, we will not disturb the trial court's ruling absent an abuse of discretion. "The term `abuse of discretion' connotes more than error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. To find an abuse of discretion, this court must find that the trial court committed more than an error of judgment. State v. Reed (1996), 110 Ohio App.3d 729, 752
citing State v. Sage, supra.
 {¶ 47} RC 2907.02 (B) provides that "if a person is guilty of rape, the victim was less than thirteen years of age, and the person `purposely compels the victim to submit by force or threat of force,' the person `shall be imprisoned for life'."
 {¶ 48} The Supreme Court has stated:
 {¶ 49} "* * * The force and violence necessary in rape is naturally a relative term, depending upon the age, size and strength of the parties and their relation to each other; as the relation between father and daughter under twelve years of age. With the filial obligation of obedience to the parent, the same degree of force and violence would not be required upon a person of such tender years, as would be required were the parties more nearly equal in age, size and strength. * * * RC 2907.02 (B) requires only that minimal force or threat of force be used in the commission of a rape. * * * We also recognize the coercion inherent in parental authority when a father sexually abuses his child.
 {¶ 50} "* * *Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established. * * *"
(Emphasis added.)
 {¶ 51} State v. Eskridge (1988), 38 Ohio St.3d 56, 58-59. We acknowledge that the Court in Eskridge lowered the threshold for proving the element of force in rape when the filial obligation of obedience is present. In keeping with the holding in Eskridge, we find that in the case before us, the prosecutor was entitled to elicit testimony regarding physical abuse by the defendant in the household in order to demonstrate that "the children's will was overcome by fear or duress." Id.
 {¶ 52} Kristen testified that she was punished and locked in the attic when she was "bad." When asked by the prosecutor what she did to be bad, she responded that when she was bad she did not listen to her father.
 {¶ 53} The testimony elicited by the children that they had been physically abused when they were "bad" establishes fear of the defendant. Thus, this testimony was properly considered by the jury in determining whether the children submitted to the defendant's sexual abuse under a threat of force. Accord State v. Schilling (Feb. 12, 2002), Tuscarawas App. No. 2001 AP 01 0001, 2002-Ohio-775. While the trial court admitted some cumulative testimony with regard to the numerosity of incidents of corporal punishment, we find this error to be harmless.
 {¶ 54} With regard to the defendant's complaint of alleged prosecutorial misconduct, we note that the conduct of a prosecuting attorney during the course of trial cannot be made a ground for error unless that conduct deprived the defendant of a fair trial. State v.Papp (1978), 64 Ohio App.2d 203. Having determined that the trial court did not err in allowing other acts testimony, the prosecutor was entitled to refer to such testimony in her closing argument. These assignments of error are overruled.
 {¶ 55} "III. The trial court erred in finding the children competent to testify when the court did not consider the five factors required in State v. Frazier (1991), 61 Ohio St.3d 247."
 {¶ 56} The defendant avers in his third assignment of error that the trial court conducted brief and incomplete voir dire examinations of the children in direct contravention of State v. Frazier (1991),61 Ohio St.3d 247 and thus erred by finding them competent to testify. We disagree.
 {¶ 57} The Supreme Court stated in State v. Frazier, supra:
 {¶ 58} "Evid.R. 601 provides that `every person is competent to be a witness except: (A) * * * children under ten (10) years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly * * *.'
 {¶ 59} "It is the duty of the trial judge to conduct a voir dire examination of a child under ten years of age to determine the child's competency to testify. Such determination of competency is within thesound discretion of the trial judge. The trial judge has the opportunity to observe the child's appearance, his or her manner of responding to the questions, general demeanor and any indicia of ability to relate the facts accurately and truthfully. Thus, the responsibility of the trial judge is to determine through questioning whether the child of tender years is capable of receiving just impressions of facts and events and to accurately relate them. See State v. Wilson (1952), 156 Ohio St. 525,103 N.E.2d 552. (Emphasis added.)
 {¶ 60} In the voir dire examination in this case, Kristen stated:
 {¶ 61} "THE COURT: * * * It's real important that you answer the questions and tell the truth. And there's a big difference sometimes between telling the truth and not telling the truth.
"Do you remember that? Did anybody tell you that?
 {¶ 62} "THE MINOR: Yes." (T. 1053).
 {¶ 63} She further stated:
 {¶ 64} "THE COURT: When you don't tell the truth, what does that mean?
 {¶ 65} "THE MINOR: You lie.
 {¶ 66} "THE COURT: Yes. You lie. Yes. And we need you to tell the truth. Will you do that for us today?
 {¶ 67} "THE MINOR: Yes." (T. 1055).
 {¶ 68} During the examination, Kristen also told the judge how many students were in her class at school and she distinguished among and stated the names of all of her biological and foster brothers and sisters. We find that the trial judge did not abuse her discretion in finding Kristen competent to testify. Further, upon direct examination by the prosecutor, Kristen was able to identify two examples of a lie and noted that if a person tells a lie, they will get in trouble.
 {¶ 69} In the voir dire examination of Aaron, he stated:
 {¶ 70} "THE COURT: Do you know the difference between telling the truth and not telling the truth?
 {¶ 71} "A: Yes
 {¶ 72} "THE COURT: What happens if you don't tell the truth?
 {¶ 73} "A: You get in trouble." (T. 1329-1330).
 {¶ 74} Aaron further testified:
 {¶ 75} "THE COURT: * * * But if she asks you a question, could you tell her what the honest answer is? Got to tell the truth. Will you tell the truth?
 {¶ 76} "A: Yes." T. 1332-1333).
 {¶ 77} (Aaron also told the judge the name of his teacher, that there were girls and boys in his class, and he named the prosecutor. We find that the trial court did not abuse her discretion in finding Aaron competent to testify. Further, upon direct examination by the prosecutor, Aaron identified three examples of a lie and stated that if a person were to tell a lie, that person would get in trouble.
 {¶ 78} In the voir dire examination of Ryan he stated his age, the names of the people with whom he lived, and the name of the prosecutor. He further stated:
 {¶ 79} "THE COURT: And what I need to know from you is whether or not you know the difference between telling the truth and telling a lie.
 {¶ 80} "A: Okay.
 {¶ 81} "THE COURT: Do you know the difference?
 {¶ 82} "A: Yes.
 {¶ 83} "THE COURT: And if you tell a lie, what happens?
 {¶ 84} "A: You'll get in trouble.
 {¶ 85} "THE COURT: * * * Raise your hand. Say I promise to tell the truth.
 {¶ 86} "A: I promise to tell the truth. * * *
 {¶ 87} "THE COURT: Will you tell the truth even if its uncomfortable for you?
 {¶ 88} "A: Yes.
 {¶ 89} "THE COURT: And you love your dad, right?
 {¶ 90} "A: Yes.
 {¶ 91} "THE COURT: But would you tell the truth even though you loved your dad?
 {¶ 92} "A: Yes. * * *" (T. 1383-1385).
 {¶ 93} We find that the trial judge did not abuse her discretion in finding Ryan competent to testify. Further, upon direct examination by the prosecutor, Ryan identified three examples of a lie and stated that he knew that it was wrong to tell a lie.
 {¶ 94} While we believe that the trial judge could have conducted more extensive voir dire examinations of the Krzywkowski children, we accord great deference to her judgment that the children were competent to testify. The trial judge was in the best position to determine whether these children were capable of receiving just impressions of facts and events and to accurately relate them. Their responses during the examinations demonstrated that they possessed an understanding of truth and falsity and appeared to appreciate the responsibility to be truthful. Accord State v. Frazier, supra.
 {¶ 95} This assignment of error is without merit.
 {¶ 96} "IV. The trial court erred by denying defense counsel the right to participate in an examination of witness' statements as provided by Criminal Rule 16 (b)(1)(g)."
 {¶ 97} The defendant argues in his fourth assignment of error that the trial court erred in finding that notes regarding the foster child's behavior made by the foster mother and given to the foster care agency, did not constitute a "witness statement" as contemplated by Crim.R. 16 (B) (1)(g). We agree with the trial court.
 {¶ 98} Crim.R. 16 (B) (1) (g) provides:
 {¶ 99} "Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement. * * *
 {¶ 100} "* * * Whenever the defense attorney is not given the entire statement, it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal." It is well-settled that the appellant has the burden of demonstrating an error by reference to matters made part of the record in the court of appeals. Knapp v. Edwards Laboratories (1980), 61 Ohio St.2d 197, 199. App.R. 9(B). "When portions of the record necessary for determination of an assigned error are absent, the reviewing court has nothing to pass on and has no choice but to presume the validity of the trial court's proceedings." Metzger v. Metzger (Aug. 21, 1989), Crawford App. No. 3-87-89. See also Helton v. Helton (1994), 102 Ohio App.3d 733, 737; Ostrander v. Parker Fallis Insulation Co. (1972), 29 Ohio St.2d 72.
 {¶ 101} In this case, the notes that Sharon Harpel made after Kristen acted out by exhibiting signs of sexual abuse are absent from the record. We are unable to review them and therefore presume regularity and affirm the ruling of the trial court that those notes did not constitute a witness statement as contemplated by Crim.R. 16.
 {¶ 102} Further, while the trial court determined that the notes did not constitute a "witness statement," the court noted that it had already conducted an in camera inspection of the notes and found no inconsistencies with Ms. Harpel's testimony.
 {¶ 103} Lastly, we note our support for the proposition that statements in the "possession, custody or control of the state are discoverable." Crim.R. 16 (B)(1)(a) and (b). State v. Bumagin (Oct. 16, 1986), Cuyahoga App. No. 51090. We believe that the notes in question were in the possession, custody and control of SAFY, not the state and, as such, agree with the trial court's determination that the notes were not a "witness statement" pursuant to Crim.R. 16 (B)(1)(g). We therefore overrule this assignment of error.
 {¶ 104} "V. The trial court erred by permitting the opinion testimony of a medical doctor without permitting defense counsel the right to examine the medical records relied upon by the witness."
 {¶ 105} The defendant asserts that the trial court erred by denying defense counsel the opportunity to examine medical records allegedly relied upon by Dr. Gemmill, the state's expert witness, in rendering his expert opinion. Specifically, the defendant argues that Dr. Gemmill relied upon the children's confidential medical records, failed to include that information in his report, and as a result the trial court erred in admitting his testimony. We disagree.
 {¶ 106} Evid. R. 705 states:
 {¶ 107} "The expert may testify in terms of opinion or inference and give his reasons therefore after disclosure of the underlying facts or data. This disclosure may be in response to a hypothetical question or otherwise."
 {¶ 108} A review of the record indicates that Dr. Gemmill testified on direct examination with regard to Kristen, Aaron and Ryan that upon arrival at the clinic, the children were all taken to be interviewed by either himself or one of his co-workers in order to obtain a history. He testified that this was the standard procedure for evaluating children who were alleged to be sexually abused. Dr. Gemmill further testified that seventy-five percent of a diagnosis of whether a child has been sexually abused is on the basis of this history that is taken. Dr. Gemmill clearly stated in his direct testimony that his opinions were based on the medical examination and historical evaluation. In his examination of all three children, he found that there was little to no physical evidence indicating sexual abuse. However, he opined that both Kristen and Ryan had been sexually abused. Dr. Gemmill further testified that the inappropriate treatment that Aaron suffered was more likely physical abuse rather than sexual abuse. Dr. Gemmill did not testify that he relied upon other undiscovered materials or reports in making his determinations. Further, the defendant had the opportunity to thoroughly cross-examine Dr. Gemmill regarding his testimony. Therefore, we find the defendant's assignment of error to be without merit.
 {¶ 109} "VI. The trial court erred by permitting a social worker to testify regarding the conduct of the Krzywkowski children, when the witness had neither interviewed nor examined the children."
 {¶ 110} In his sixth assignment of error, the defendant avers that the trial court erred in allowing Licensed Independent Social Worker Cynthia King to testify regarding the conduct of the Krzywkowski children when the information and facts upon which she relied, contained in various reports, was predicted on the work of others. We disagree with this contention.
 {¶ 111} Evid. R. 703 states:
 {¶ 112} "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." (Emphasis added.)
 {¶ 113} Evid. R. 703 clearly states that an expert witness may base an opinion solely on evidence admitted at trial. The defendant's contention that an expert must essentially personally perceive all of the information upon which he or she relies is illogical. Expert witnesses are often relied upon to give an expert opinion regarding facts and circumstances of which they have no personal knowledge or perception. Instead, they are called upon to opine on facts and circumstances that have been admitted into evidence in a particular case.
 {¶ 114} In this case, Ms. King relied upon evidenced that was admitted into evidence, specifically the children's behavior. She used the evidence of the children's behavior to opine that such behavior is indicative of sexual abuse. For instance, Ms. King stated that the game between Aaron and his brother which Aaron testified to at trial was sexualized in nature and indicative of sexual abuse. She also determined that other indicators of sexual abuse of the children were present, including, inter alia, mutilation of animals and insects, bed-wetting, and repeated masturbation, all of which had been admitted into evidence during direct testimony by either the children or the foster mothers.
 {¶ 115} The defendant relies on State v. Robinson (Sept. 22, 1994), Franklin App. No. 94APA02-222 for the support that Ms. King was required to interview the children before testifying and rendering an opinion as to whether the behavior they exhibited was indicative of sexual abuse. In Robinson, the appellate court held that the social worker's[2]
and medical doctor's expert testimony was admissible because both of them had personally interviewed the children in question. There, the court noted that "where an expert bases his opinion, in whole or in major part, on facts or data perceived by him, the requirements of Evid.R. 703 are satisfied." Id. citing State v. Solomon (1991), 59 Ohio St.3d 124. However, despite the defendant's contention as such, these cases do not purport to identify the only manner in which to comply with Evid.R. 703.
 {¶ 116} The defendant also misconstrues the holding in State v.Francis (Jan. 25, 2000), 5th Dist.Ct.App. No. 98CA13, understanding it to require that an expert witness interview the child before opining. InState v. Francis, however, the issue was whether under Evid.R. 705, it was proper for the expert social worker[3] to state the underlying facts upon which her opinion was based. We find State v. Francis
inapposite in this particular issue.
 {¶ 117} The trial court did not abuse its discretion in allowing Ms. King to testify as an expert despite not personally interviewing the children. We therefore overrule this assignment of error.
 {¶ 118} "VII. The trial court erred by permitting the hearsay recitation of information by social workers who's participation in the case consisted of neither treatment nor diagnosis of the declarant children."
 {¶ 119} In his seventh assignment of error, the defendant avers the trial court abused its discretion by improperly permitting Ms. King and Julie Prettyman, a licensed social worker, to recite hearsay evidence to the jury thereby impermissibly bolstering the veracity of the state's case. We disagree.
 {¶ 120} Pursuant to Ohio case law and Evid.R. 803(4), statements made by a social worker for the purposes of medical diagnosis or treatment are admissible. State v. Boston (1989), 48 Ohio St.3d 108. This exception to the hearsay rule states:
 {¶ 121} "Statements for purposes of medical diagnosis or treatment and describing medical history or past or present symptoms, pain, or sensation, or in the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
 {¶ 122} Therefore, the relevant inquiry is whether the statements are reasonably pertinent to diagnosis or treatment. State v. Chappell (1994), 97 Ohio App.3d 515, 531. Accord State v. Jones (Dec. 23, 1999), Cuyahoga App. No. 75390; State v. Miller (1988) 43 Ohio App.3d 44, 46;Presley v. Presley (1990) 71 Ohio App.3d 34.
 {¶ 123} Ms. Prettyman was a social worker from the Cuyahoga County Department of Children and Family Services Intake Department. She testified that her role in interviewing the children was to investigate allegations of sexual abuse and initiate an interview with the children. She further stated the purpose of interviewing the children was "to assess the child's needs in terms of safety and whether or not the child will need treatment of any kind, including medical treatment and/or counseling." (T. 1643). Her role was critical in determining how quickly and what type of subsequent treatment was necessary for the children. We find that Ms. Prettyman's role was pertinent to medical treatment or diagnosis, and thus her testimony falls clearly within the exception to the hearsay rule under Evid.R. 803(4).
 {¶ 124} With regard to Ms. King, there is no dispute that Ms. King's role was not pertinent to diagnosis or treatment. As such, her testimony in that regard constituted hearsay. However, while we find that the trial court erred in admitting the testimony of Ms. King, we find this error to be harmless. Her testimony was, at most, cumulative. A review of the transcript reveals that Ms. King's statements repeated that which had been testified to by the children, Dr. Gemmill and the foster mothers. We cannot say that the admission of these hearsay is inconsistent with substantial justice, nor has it affected the substantial rights of the defendant. Therefore, we do not find reversible error and overrule this assignment of error.
 {¶ 125} "VIII. Mr. Krzywkowski is entitled to a new trial because the verdicts are against the manifest weight of the evidence."
 {¶ 126} In his eighth assignment of error, the defendant contends that the guilty verdicts are against the manifest weight of the evidence. Specifically, the defendant avers that the prosecution failed to provide any evidence of the dates on which the offenses occurred, and that the evidence that was produced was unfairly prejudicial and therefore should not have been admitted. We disagree.
 {¶ 127} In determining if a conviction is against the manifest weight of the evidence, the appellate court reviews the record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Martin (1983), 20 Ohio App.3d 172, citingTibbs v. Florida (1982), 457 U.S. 31. The court should consider whether the evidence is credible or incredible, reliable or unreliable, certain or uncertain, conflicting, fragmentary, whether a witness was impeached and whether a witness had an interest in testifying. State v. Mattison
(1985), 23 Ohio App.3d 10.
 {¶ 128} Where a judgment is supported by competent, credible evidence going to all the essential elements of the case, a reviewing court will not reverse the judgment as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constru. Co. (1978),54 Ohio St.2d 279, syllabus. Morever, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact to decide. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus; see also, State v. Smith (2000), 87 Ohio St.3d 424,2000-Ohio-450.
 {¶ 129} In sexual abuse cases involving young children, they are often unable to remember exact dates and times when the offenses occurred, particularly when the offenses involved a repeated course of conduct over a lengthy period of time. State v. Barnecut (1988),44 Ohio App.3d 149. "Because the precise date and time of the offense of rape are not essential elements of that crime, a certain degree of inexactitude in averring the date of the offense is not necessarily fatal to its prosecution." State v. Marrs (June 28, 2002), Montgomery Cty. App. No. 18903, 2002-Ohio-3300 citing State v. Sellards (1987),17 Ohio St.3d 169; State v. Lawrinson (1990), 49 Ohio St.3d 238.
 {¶ 130} In this case, the prosecution established that the children were living with the defendant during the times stated on the indictment.
 {¶ 131} The defendant does not dispute that verdict was against the manifest weight of the evidence presented at trial, rather he argues that the evidence at trial was inadmissible. Having addressed the admissibility of certain testimony in the above assignments of error, we overrule this assignment of error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MICHAEL J. CORRIGAN, P.J., AND JAMES J. SWEENEY, J., CONCUR.
[1] Cuyahoga County Department of Children and Family Services makes determinations in cases that allegations of sexual and physical abuse are either "substantiated," "unsubstantiated," or "indicated."
[2] The social worker in that case was also Cynthia King.
[3] The social worker in that case was also Cynthia King.