JOURNAL ENTRY AND OPINION
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct. Prac.R. II, Section 2(A)(1). *Page 3 
{¶ 1} Appellant Bernard Pruitt appeals his conviction. Pruitt assigns the following errors for our review:
 "I. The defendant was denied his rights to due process and a fair trial under the State and Federal Constitutions when the court erred by admitting the enormously prejudicial testimony that he had threatened to kill a judge and the children of the arresting officers."
 "II. The defendant was denied his right to the effective assistance of counsel when defense counsel failed to protect his rights during trial."
 "III. The defendant was denied his constitutional right to a fair trial because of unfairly prejudicial prosecutorial misconduct as the prosecutor deliberately elicited testimony that its witness offered to take a polygraph."
 "IV. The jury's decision finding the defendant guilty of aiding and abetting the failure to comply was not supported by sufficient probative evidence when no evidence suggested that the defendant — a mere passenger — assisted or encouraged the driver's flight from police."
 "IV. The jury's decision finding the defendant guilty of two counts of felonious assault of a peace officer was not supported by sufficient evidence and was against the manifest weight of the evidence when the officer did not see how or in which direction the gun fired and it was only fired a single time."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the decision of the court. The apposite facts follow.
 {¶ 3} On December 20, 2005, the Cuyahoga County Grand Jury indicted Pruitt for two counts of felonious assault on a police officer, one count of failure to comply with an order or signal of a police officer, and one count of having a weapon while under a disability. Both counts of felonious assault on a peace officer and the *Page 4 
failure to comply with the order or signal of a police officer were indicted with one, three, and five year gun specifications. Pruitt pled not guilty at the arraignment; the case proceeded to a jury trial.
 Jury Trial {¶ 4} At trial, Officer Andrew Papaleo, of the Cleveland Police Department, testified that on December 5, 2005, he was on routine patrol with his partner Officer Chris Haist. Officer Papaleo testified that at approximately 3:00 a.m., they spotted a minivan driving with the high beams on. After checking the license plate, he and Officer Haist discovered the license plate did not match the van. In an attempt to initiate a traffic stop, Officer Haist pulled behind the van and activated the overhead lights and sirens. In response, the minivan accelerated, ran through several red lights, and proceeded onto Interstate 71 South.
 {¶ 5} Officer Papaleo testified that they pursued the minivan as it sped along the highway and eventually slowed down to exit on to West 14th Street. After the minivan slowed down, Officer Papaleo observed the sliding passenger door open and saw a muzzle flash coming from the area of the door about four or five feet off the ground. The muzzle flash was accompanied by the sound of gunfire, which prompted Officer Haist to slow the pace of pursuit and request backup.
 {¶ 6} The minivan turned down a side street, slowed down, rolled to a stop, and crashed into a fence. Officer Papaleo observed four males exit the minivan, two *Page 5 
from each side, who then fled the scene. Officers Papaleo and Haist approached the vehicle and secured a lone female occupant, who was later identified as Tasabra Baker. The backup officers pursued the four males who had fled on foot.
 {¶ 7} Officer Papaleo testified that approximately five minutes later, the backup officers returned with Pruitt, and another suspect, David Reed, who was later determined to be the driver. Officer Papaleo testified that David Reed directed Officer Haist to the location where the gun could be found. Approximately five minutes later, on the side of the street where Officer Papaleo had seen the muzzle flash, Officer Haist found a small two shot Derringer pistol. The pistol had a cream colored handle, was loaded with one live shell and one spent shell casing.
 {¶ 8} Officer Haist testified in conformity with his partner Officer Papaleo. The difference in their testimony was his perspective as the driver of the patrol car rather than the passenger. Officer Haist testified that during the chase, he heard one gunshot that came from the direction of the minivan. In response, he slowed the pursuit to distance themselves from the minivan.
 {¶ 9} Tasabra Baker testified that on December 5, 2005, she attended a birthday party at the Golden Lady bar with Reed and Pruitt. According to Baker, Reed drove her and Pruitt to the bar. When they arrived at the bar, but prior to exiting the van, Pruitt asked her to find out if the bar was checking for weapons at the door. Baker determined that the bar would not be checking for weapons and *Page 6 
indicated that to Pruitt, who then slid a small pearl-handled two shooter handgun into his boots. Baker, Reed, and Pruitt then entered the bar.
 {¶ 10} Baker testified that while at the bar, she, Reed and Pruitt were joined by two other males. After some time, the five left the Golden Lady bar and headed towards Baker's cousin's house. Baker stated that on the way to her cousin's house, she sat in the passenger's seat next to Reed, who was driving. Pruitt sat directly behind her in the first row back seat nearest the sliding door. The two other males sat in the second row back seat.
 {¶ 11} Baker testified that at some point she fell asleep, but was awakened to the sound of sirens and everyone yelling for Reed to stop. During the chase, Baker heard the sound of a gunshot. When she turned around, she saw Pruitt with a gun in his hand, pulling it in from the window of the sliding doors. Baker stated that Pruitt tried to hand it off to the other occupants. Moments later, Pruitt tossed the gun out the window. When the minivan came to a stop, all the males exited the vehicle and fled.
 {¶ 12} Reed testified that on December 5, 2005, he left the Golden Lady bar at approximately 2:15 a.m. in the company of Pruitt, Baker, Baker's brother, Tone, and another male known as "Twin." Reed stated that he was driving. Baker sat beside him in the front passenger seat, while Pruitt sat directly behind Baker in the first row back seat. Reed stated that as he approached the area of East 13th Street and *Page 7 
Chester Avenue, he observed a patrol car make a U-turn and pull behind his minivan. When the cruiser activated its lights and sirens, Pruitt stated he had a gun, displayed the gun, and indicated that he wanted to exit the vehicle. Reed accelerated, and proceeded onto the highway, with the police in pursuit.
 {¶ 13} Reed testified that as he exited the highway onto West 14th Street, Pruitt slid the van door open. Reed stated he heard a gunshot from close range as if it was close to his ears. Reed observed Pruitt pull back into the van and slide the door shut, but Pruitt was no longer in possession of the gun. Reed continued driving for about twenty seconds, came to a stop, all the males exited the vehicle and fled.
 {¶ 14} Reed testified that the police apprehended him and Pruitt a few minutes later. Reed stated that he directed the police to where Pruitt had thrown the gun away. Reed also stated that while he and Pruitt were being transported to the police station, Pruitt told him to blame the shot fired on the two males who escaped.
 {¶ 15} Finally Reed testified that he did not stop when the police activated the lights and siren because he was on parole and did not have a driver's license. Reed stated that Pruitt's possession of the firearm was the main reason that he did not stop.
 {¶ 16} Stacey Paythruss, who at the time of trial was in county jail on a pending felony escape charge, testified that in February 2006, he met Pruitt while both were recuperating in the jail's medical dorm. According to Paythruss, due to his years *Page 8 
spent in and out of prison, he developed a reputation among fellow prisoners as being knowledgeable in legal matters. Paythruss stated that Pruitt came to him for legal advice concerning his case. In seeking Paythruss' advice, Pruitt disclosed the facts of the case and indicated that Baker was the only person who could "sink" him, because she had seen him fire the gun.
 {¶ 17} Paythruss further stated that Pruitt indicated that he was trying to shoot at the patrol car's windshield to cause an accident and have the police abandon their pursuit. Paythruss also stated that Pruitt indicated that he threw out the gun and instructed Reed to slow down so that the occupants could exit the vehicle and flee.
 {¶ 18} On April 21, 2006, the jury found Pruitt guilty on all counts. On May 5, 2006, the trial court sentenced Pruitt to sixteen years in prison.
 Manifest Weight of Evidence {¶ 19} For ease of discussion and where appropriate, we will address Pruitt's assigned errors out of order. In the fifth assigned error, Pruitt argues the jury's verdict finding him guilty of two counts of felonious assault of a peace officer was against the manifest weight of the evidence. We disagree.
 {¶ 20} When an appellant challenges a conviction on manifest weight grounds, we review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, "and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of *Page 9 
justice that the conviction must be reversed and a new trial ordered."[1] The discretionary power to grant a new trial should be exercised only in exceptional cases in which the evidence weighs heavily against the conviction.[2]
 {¶ 21} Stated succinctly, a reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all elements of an offense have been proven beyond a reasonable doubt.[3]
 {¶ 22} After reviewing the record in this case, and viewing the evidence presented in the light most favorable to the prosecution, we determine that there is sufficient evidence to sustain Pruitt's conviction. R.C. 2903.11(A)(2) provides in pertinent part:
 "No person shall knowingly * * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."
 {¶ 23} From the record presented, it is undisputed that Pruitt was in possession of a gun, a dangerous ordnance, and ample testimony was provided that he used it in an attempt to cause physical harm to two police officers. Officer Papaleo testified that he observed the passenger door of the minivan open, observed a muzzle flash approximately four to five feet off the ground, and heard the *Page 10 
sound of a gunshot. Officer Haist testified that he heard a gunshot coming from the direction of the minivan and responded by slowing the pace of pursuit to distance himself from the minivan. Officer Haist testified that he recovered the gun in the location that Officer Papaleo observed the muzzle flash.
 {¶ 24} In addition, Baker testified that during the chase, she heard the sound of a gunshot, turned around, and witnessed Pruitt with a gun in his hand, pulling it in from the window. Baker testified that Pruitt tried to hand the gun off to the other passengers, but then disposed of the gun by tossing it out the window.
 {¶ 25} Further, Reed testified that when the patrol car pulled behind his minivan, Pruitt indicated he had a gun in his possession and displayed it. Reed testified that he saw Pruitt slide the van door open, after which, Reed heard a single gunshot. Reed stated the gunshot sounded as if it was close to his ears.
 {¶ 26} Finally, Paythruss testified that while he and Pruitt were in the jail's medical dorm, Pruitt disclosed his motive for firing at the police car. Paythruss testified that Pruitt indicated that he was trying to shoot at the police windshield to cause the police to have an accident and abandon the chase.
 {¶ 27} For the foregoing reasons, we conclude that a rational jury could have found the essential elements of felonious assault of a police officer was proven beyond a reasonable doubt. *Page 11 
 {¶ 28} In addition, after a review of the entire record, and after weighing the testimony of the witnesses and the evidence presented, we do not find Pruitt's assertion that the gun went off after he tossed it out the van to be credible. The evidence overwhelmingly indicates that Pruitt fired the gun at the patrol car. Consequently, we cannot find that the jury lost its way in this case, and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Accordingly, we overrule the fifth assigned error.
 Aiding and Abetting {¶ 29} In the fourth assigned error, Pruitt argues that he was improperly convicted of aiding and abetting Reed's failure to comply with the signal or order of a police officer. We disagree.
 {¶ 30} Contrary to Pruitt's argument, that he was a mere passenger in a vehicle that fled from the police, the record contains sufficient evidence to support the charge of aiding and abetting. R.C. 2923.03
prohibits complicity with others to commit crimes and provides as follows:
 "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 "(1) Solicit or procure another to commit the offense;
 "(2) Aid or abet another in committing the offense;
 "(3) Conspire with another in committing the offense in violation of Section 2923.01 of the Revised Code; *Page 12 
 "(4) Cause an innocent or irresponsible person to commit the offense."[4]
 {¶ 31} "A person aids and abets another when he assists another in the accomplishment of a common design or purpose."[5] The accomplice's criminal intent may be inferred, by direct or circumstantial evidence, and from the presence, companionship, and conduct of the accomplice both before and after the offense is committed.[6]
 {¶ 32} When the evidence is viewed in the light most favorable to the prosecution, the jury could find that Pruitt was the catalyst which prompted Reed's failure to comply and subsequent flight from the police. Here, the evidence indicates that as soon as the police attempted to pull the vehicle over, Pruitt announced that he had a gun and displayed it. Reed, who was on parole and did not have a driver's license, decided to flee. Reed testified that Pruitt's possession of the gun was the main reason he did not stop.
 {¶ 33} In addition, Pruitt's action in firing at the police complicated the situation and pressured Reed to continue his flight. A person acts knowingly regardless of his purpose when he is aware that his conduct will probably cause a certain result or *Page 13 
he is aware that his conduct will probably be of a certain nature. Knowingly also means that a person is aware of the existence of the facts that his acts will probably cause a certain result or be of a certain nature.[7]
 {¶ 34} Based upon our review of the record in compliance with the applicable standards, construing the evidence in the light most favorable to the prosecution, we find any rational trier of fact could have properly found Pruitt committed the offense charged beyond a reasonable doubt. Accordingly, we overrule the fourth assigned error.
 Admission of Evidence {¶ 35} In the first assigned error, Pruitt argues the trial court erred by admitting evidence that he had threatened to kill a judge and the children of arresting officers. We disagree.
 {¶ 36} When the trial court determines that certain evidence will be admitted or excluded from trial, it is well established that the order or ruling of the court will not be reversed unless there has been a clear and prejudicial abuse of discretion.[8] An *Page 14 
abuse of discretion connotes more than error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.[9]
 {¶ 37} The record before us indicates that the trial court took precautions to protect Pruitt's rights to a fair trial. Prior to Paythruss' testimony, the trial court held a hearing outside of the jury to determine whether he should be allowed to testify. The trial court ruled as follows:
 "Based on the arguments that you are giving me right now, he will be permitted to testify to whatever statement Pruitt made to him with regard to the 6th of December with these charges. I do think it is too prejudicial and not outweighed by the probative value for this witness to go ahead and testify to what Pruitt said with regard to Judge Greene or the writing of the letter or the police officers two months after the fact. * * * We are here to decide what occurred on the December date. * * * Certainly raise your issue by objection because either one of you may open up those doors. I don't know. I heard what you said, Mr. Sidoti, and that is that you don't want that statement in. It's not in right now. If something happens, we have to revisit it at the time it happens, okay?"
 "* * *
 "The other parts of what I guess is in that statement, why you are calling him to testify, that will be permitted. You will have to tell that to the witness before he comes out here that he is limited as well when he answers so it doesn't get blurted out."[10]
 {¶ 38} The record reveals that during direct examination of Paythruss, the State did not elicit any testimony and Paythruss did not offer any testimony regarding *Page 15 
the threats to Judge Greene or to the arresting officers' children. However, during cross-examination, Pruitt's defense counsel pursued a line of questioning regarding Paythruss' motivation for testifying against Pruitt. The following exchange took place:
 "Q. So your testimony here today is in all the times in talking with all these people in regards to drug cases, you never testified in other cases before?
 A. No.
 Q. Don't you think it is a coincidence you currently have a pending case and you happen to testify in this one.
 A. All the other times I had pending cases.
 Q. You never testified before?
 A. I never had to.
 Q. You didn't have to in this case.
 A. I really did.
 Q. You did?
 A. Yeah.
 Q. Why is that?
 A. `Cuz some people could have gotten killed.
 Mr. Sidotti: I ask this jury to disregard that.
 The Court: Overruled."[11] *Page 16 
 {¶ 39} The above excerpt reveals that Pruitt's defense counsel opened the door for the statements regarding Pruitt's threat to kill a judge and the arresting officers, to come before the jury. In a sidebar discussion following the above excerpt the State argued that because Pruitt's defense counsel had been insinuating throughout his cross-examination that Paythruss was testifying in exchange for a plea offer, the jury needed an explanation why this case was different. Pruitt's attorney argued that Paythruss was referring to the events of December 5, 2005, and not the threats to kill a judge and the arresting officers' children. The State argued it should be able to ask Paythruss to clarify who could be killed.
 {¶ 40} The trial court ruled as follows:
 "If he goes ahead and gives an answer that he meant the police and shooting, there is no issue. If he goes further, there is an issue. He gets to ask the question."[12]
 {¶ 41} On re-direct examination, Paythruss stated that he was referring to the threats Pruitt made about killing a judge and the children of the arresting officers. Here, Pruitt's trial counsel's line of questioning opened the door for the statement to come in. A party cannot take advantage of an error he invited or induced.[13] Further, a party who invites an error at trial has no one to blame but himself and cannot seek *Page 17 
solace in the appellate court.[14] It was, therefore, not an abuse of discretion for the trial court to refuse to give a curative instruction or grant a mistrial.[15]
 {¶ 42} Moreover, as discussed in the fourth and fifth assigned errors above, the State presented sufficient evidence to convict Pruitt of the crimes for which he was charged. Thus, the evidence of the alleged threats to kill a judge and the children of the arresting officers did not necessarily prejudice Pruitt. Accordingly, we overrule the first assigned error.
 Prosecutorial Misconduct {¶ 43} In the third assigned error, Pruitt argues he was denied a fair trial because the prosecutor deliberately elicited testimony that Paythruss offered to take a polygraph. We disagree.
 {¶ 44} In analyzing claims of prosecutorial misconduct, the test is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused.[16] The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor."[17] Where it is clear beyond a reasonable doubt *Page 18 
that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed.[18] Thus, in reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial.[19]
 {¶ 45} In the instant case, during direct examination of Detective Tim Sopkovich, the detective who met Paythruss regarding Pruitt's alleged threat against a judge and the children of the arresting officers, the following exchange took place:
 "Q. Was he willing to submit to any tests or anything else?
 A. Yes. He said if need be, he would do a voice stress or polygraph test.
 Q. He offered that?
 A. That is correct."[20]
 {¶ 46} Generally, evidence of a professed willingness to submit to a polygraph examination is inadmissible.[21] Pruitt cites several cases, including State v. Croston,[22] to support his argument that the State deliberately elicited inadmissable *Page 19 
testimony. However, the instant case is easily distinguishable. The cases Pruitt cites all concern the accused's willingness to submit to, or the actual taking of a polygraph test. Here, it involves a witness' willingness to take a polygraph test.
 {¶ 47} Nonetheless, the record before us indicates that Pruitt was not prejudiced by this isolated, alleged misconduct. As we have previously discussed, the evidence adduced at trial overwhelmingly supported the jury's finding Pruitt guilty of the crimes charged. Thus, we conclude that the isolated, alleged misconduct did not deprive Pruitt of a fair trial. Accordingly, we overrule the third assigned error.
 Ineffective Assistance of Counsel {¶ 48} In the second assigned error, Pruitt argues he was denied the effective assistance of counsel. We disagree.
 {¶ 49} We review a claim of ineffective assistance of counsel under the two-part test set forth in Strickland v. Washington[23] UnderStrickland, a reviewing court will not deem counsel's performance ineffective unless a defendant can show his lawyer's performance fell below an objective standard of reasonable representation and that prejudice arose from the lawyer's deficient performance.[24] To show prejudice, a defendant must prove that, but for his lawyer's errors, a *Page 20 
reasonable probability exists that the result of the proceedings would have been different.[25] Judicial scrutiny of a lawyer's performance must be highly deferential.[26]
 {¶ 50} In the instant case, Pruitt specifically contends that his trial counsel was ineffective for failing to bifurcate the charge for having a weapon under a disability, and for failing to prevent testimony from Paythruss to come before the jury. We are not persuaded.
 {¶ 51} After reviewing the entire record, we cannot conclude that the performance at trial of Pruitt's attorney fell below an objective standard of reasonable representation. The failure to bifurcate the disability charge did not taint the entirety of the proceedings to the extent that a reasonable probability exists that the result of the proceedings would have been different.
 {¶ 52} The State presented sufficient evidence to convict Pruitt of felonious assault of a police officer and of aiding and abetting Reed's failure to comply with the order or signal of a police. We conclude that trial counsel's failure to bifurcate the disability charge was not prejudicial.
 {¶ 53} We have previously concluded in the first assigned error that the testimony regarding Pruitt's alleged threat to kill a judge and the children of the arresting officers did not deprive him of a fair trial. Consequently, when viewed in its *Page 21 
entirety, Pruitt has failed to show that his attorney's performance fell below an objective standard of reasonable representation. Accordingly, we overrule the second assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
CHRISTINE T. McMONAGLE, P.J., and ANN DYKE, J., CONCUR.
[1] State v. Martin (1983), 20 Ohio App.3d 172,175, citing Tibbs v.Florida (1982), 457 U.S. 31, 38, 42. See, also, State v. Thomkins
(1997), 78 Ohio St.3d 380.
[2] Martin, citing Tibbs. See, also, Thomkins, supra.
[3] State v. Eskridge (1988), 38 Ohio St.3d 56, paragraph two of the syllabus; State v. Eley (1978), 56 Ohio St.2d 169, syllabus.
[4] State v. Shropshire, Cuyahoga App. No. 85063, 2005-Ohio-3588.
[5] State v. Minor (Mar. 2, 2000), 5th Dist. No. 99CA63, at 7-8 (quoting Black's Law Dictionary (6th ed. 1990).
[6] State v. Nievas (1997), 121 Ohio App.3d 451, 456-457.
[7] State v. Bissantz (1982), 3 Ohio App.3d 108, 111.
[8] O'Brien v. Angley (1980), 63 Ohio St.2d 159, 163.
[9] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
[10] Tr. at 457-459.
[11] Tr. at 498-499.
[12] Tr. at 505.
[13] Center Ridge Ganley, Inc. v. Stinn (1987), 31 Ohio St.3d 310;Hal Artz Lincoln Mercury, Inc. v. Ford Motor Co. (1986),28 Ohio St.3d 20, at paragraph one of the syllabus.
[14] State v. Chappell (1994), 97 Ohio App.3d 515. See, also,Lester v. Leuck (1943), 142 Ohio St. 91; State v. Kniep (1993),87 Ohio App.3d 681.
[15] State v. Hill (1987), 37 Ohio App.3d 72.
[16] State v. Jones, 90 Ohio St.3d 403, 420, 2000-Ohio-187, citingState v. Smith (1984), 14 Ohio St.3d 13, 14.
[17] Id. See, also, Smith v. Phillips (1982), 455 U.S. 209, 219,102 S Ct. 940, 947, 71 L.Ed.2d 78.
[18] See State v. Loza, 71 Ohio St.3d 61, 78, 1994-Ohio-409.
[19] Darden v. Wainwright (1986), 477 U.S. 168, 106 S.Ct. 2464,91 L.Ed.2d 144.
[20] Tr. at 560.
[21] See State v. Hegel (1964), 9 Ohio App.2d 12.
[22] (Dec. 5, 1988), 5th Dist. No. CA-7533.
[23] (1984), 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052.
[24] State v. Bradley (1989), 42 Ohio St.3d 136, paragraph one of syllabus.
[25] Id. at paragraph two of syllabus.
[26] State v. Sallie (1998), 81 Ohio St.3d 673, 674. *Page 1